## MILTENBERGER v. LOGANSPORT RAILWAY COMPANY.

1. In August, 1870, a first mortgage on a railroad was made. In January, 1873, a second mortgage on the same railroad was made. Both mortgages covered after-acquired property. A default on the first mortgage occurred in November, 1873, and on the second mortgage in January, 1874. In August, 1874, the second mortgagee filed a bill to foreclose the second mortgage, making the first mortgagee a party, acknowledging the priority of the first mortgage, not praying any relief against the first mortgagee, and praying for a receiver, and for the payment of his net revenue to those entitled to it. On the same day, an order was made appointing one Schuyler receiver, and directing that a copy of the order be served on the first mortgagee, a corporation, requiring it to appear "on or before" the first Monday of November then next, and authorizing the receiver to pay the arrears due for operating expenses for a period in the past not exceeding ninety days. A copy of the order was served on the first mortgagee three days afterwards, and proof of that service was filed two days after the service. In October following, the receiver, on his petitions filed, was authorized, by order, to purchase certain rolling-stock, and to pay indebtedness, not exceeding $10,000, to other connecting lines, for materials and repairs, and for ticket and freight balances, a part of which was incurred more than ninety days before the order appointing the receiver was made, and to expend a sum named in building six miles of road and a bridge, which were part of the main line of the road, and the expenditures were charged as a first lien on the earnings of the road. The first mortgagee appeared and answered on the first Monday of November, and not before. The answer objected to the creation of fresh indebtedness. Nothing more was done in the suit for eleven months. Then the receiver reported that he had built the six miles and the bridge, and purchased rolling-stock, and incurred debts therefor. He also filed a petition showing that his trust owed $232,000, and asking leave to borrow that amount and $90,000 to put the road in order, on receivers' certificates, to be made a first lien. The petition set forth a meeting of both classes of bondholders, at which, on the report of a committee, the receiver was directed, by a resolution passed, to obtain authority to borrow $322,000 on receivers' certificates. An order was made authorizing him to borrow $201,000 on receivers' certificates, payable out of income, and to be provided for in the final order of the court in the suit, if not paid out of income. Soon after four holders of first-mortgage bonds were made defendants, with leave to answer and to file a cross-bill. They answered and filed a cross-bill, in November, 1875, to foreclose the first mortgage. The cross-bill claimed that the six miles of road, and the bridge and the rolling-stock, and the other property acquired by the receiver, were subject to the lien of the first mortgage, and that the mortgagor had been insolvent from October, 1873, and affirmed the foregoing statement as to the meeting of the bondholders and their resolution, and stated that the plaintiffs in the cross-bill had desired and sought for more than a year to have the first mortgage foreclosed; that the $201,000 ought not to be borrowed and made a first lien on the road; and that the receiver ought to be removed, and

another receiver appointed under the cross-bill. In December, 1875, a reference was made to take evidence on the subject of the appointment of a new receiver. More than four months after that the first mortgagee answered the cross-bill, and, the two suits being ready for hearing, they were consolidated and heard. One decree was made in them, in May, 1876, declaring that both mortgages covered all the property held by the mortgagor when the original suit was brought and all subsequent additions thereto, and providing for a foreclosure of the right of the second mortgagee to redeem, and for the presentation to a master of claims against the property and the receiver. In July, 1876, one Claybrook was appointed additional receiver in the original suit. He acted, after Aug. 11, 1876, as sole receiver until Aug. 25, 1876, after which he and Schuyler were joint receivers, until December, 1876, when Schuyler resigned. Claybrook, on Aug. 12, 1876, took possession of the entire property which Schuyler had, including a railway twenty-three miles long, used under a lease from another company. The master reported as to claims against the property and the receiver, from time to time. The plaintiffs in the cross-bill interposed objections to making any of the claims prior in lien to the lien of the first mortgage. In January, 1879, the court, by order, allowed certain claims, many of them not over $5,000, specifying the names of the claimants and the amounts allowed, and giving the claims allowed preference in payment out of the income and proceeds of sale, over the claims of the mortgagees. In this order the plaintiffs in the cross-bill prayed an appeal to this court. In July, 1879, the court made a decree for the sale of the road as an entirety, and for the payment out of the proceeds of sale of the claims allowed, before paying any principal or interest on the mortgage debts. In this decree the plaintiffs in the cross-suit prayed an appeal from it to this court. On a hearing of the appeal, *Held:* 1. The appeals were appeals in open court, not requiring citations, and the order and the decree appealed from sufficiently designated all the appellees by name. 2. The first mortgagee was a proper party to the original bill of foreclosure, because a receiver was prayed for; and, the order appointing the receiver having been served on the first mortgagee three days after it was made, such mortgagee was bound to protect promptly the interests of the first-mortgage bondholders. 3. The original bill did not seek to create a receivership for the sole benefit of the second-mortgage bondholders. 4. The property in court under the original bill was the entire mortgaged property, and not merely the equity of redemption of the mortgagor, as against the second mortgagee. 5. The exclusive right of a second mortgagee to the income of a receivership created under a bill filed by him is limited to a case where the first mortgagee is not a party to the suit. 6. The first mortgagee having been entitled, by the terms of the first mortgage, to take possession of the mortgaged property and operate the road, and the cross-bill not having been filed for more than a year after the receiver was appointed and the first mortgagee had appeared and answered in the original suit, and it having been, in judgment of law or in fact, fully known, all the time to the first-mortgage bondholders, what was doing by the receiver in creating the claims, it was inequitable for the appellants to lie by and see the receiver and the court dealing with the property in the manner complained of, and merely protest generally and disclaim all interest under the receivership, and yet assert in the cross-bill that the property acquired by the receiver was subject to the lien of the

first mortgage, and claim the proceeds of that property without paying the debts incurred for acquiring it.

2. A court has the power to create claims through a receiver, in a suit for the foreclosure of a railroad mortgage, which shall take precedence of the lien of the mortgage. It may therefore provide that the receiver shall pay the arrears due for operating expenses for a period in the past not exceeding ninety days, and pay indebtedness, not exceeding $10,000, to other connecting lines, for materials and repairs, and for ticket and freight balances, a part of which had been incurred more than ninety days before the order appointing him was made, and purchase rolling-stock, and build six miles of road and a bridge, part of the main line of the road, and making such expenditures a lien prior to the lien of the mortgages, upheld.

3. The mortgagor held a leased road, under a written lease, providing for rent and for payment for depreciation, and for the payment of a monthly rent by the lessor to the lessee for the use of a part of the road. The successive receivers took possession of the leased road and operated it as a continuation of the mortgaged road. Part of the rent which accrued before Claybrook became receiver was unpaid. Claybrook, after he became receiver, paid the rent as it accrued. The successive receivers collected the rent monthly from the lessor for the use of a part of the road. The court allowed to the lessor, as a claim preferred to the first mortgage, a sum based on the actual value of the use of the road by the receivers, and for depreciation, and allowed, with a like preference, claims for supplies and materials furnished for the road, while so operated. *Held*, that the allowances were proper, and that the final decree was not erroneous in not requiring the accounts of the receiver to be settled before paying out of the proceeds of sale the debts allowed against him, nor in ordering the sale of the property as an entirety, without separating that acquired by the receiver.

4. The question of the jurisdiction of this court, in respect of the claims not over $5,000, was not considered.

APPEAL from the Circuit Court of the United States for the District of Indiana.

The case is stated in the opinion of the court.

*Mr. Charles M. Osborn* for the appellants.

*Mr. Benjamin Harrison* and *Mr. John G. Williams*, contra.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

On the 1st of August, 1870, the Logansport, Crawfordsville, and Southwestern Railway Company, an Indiana corporation, executed to the Fidelity Insurance, Trust, and Safe Deposit Company, a Pennsylvania corporation, located at Philadelphia, as trustee, a mortgage to secure the payment of bonds to the amount of $1,500,000, covering the railway of the mortgagor from Logansport to Rockville, in length about ninety-two

miles, with all its franchises and property used in or connected with the operation of said railway, which the mortgagor then owned or might thereafter acquire.  The bonds were coupon bonds, payable in gold, in the year 1900, with interest at eight per cent per annum, in gold, payable quarterly, on the first days of November, February, May, and August.  The mortgage provided that, in case of default in the payment of the principal or interest of any of the bonds, the mortgagor would, within six months after the default should occur, it still continuing, surrender to the trustee, on its demand, the possession of the mortgaged property, and all management and control thereof; that, if possession should be so taken, all expenses of managing and operating the property should be paid from the income, and, if the property should thereafter be sold, from the sale; that the trustee, having taken possession, might manage and operate the road and property, and receive all the income and apply it to pay the interest in default, first paying all expenses of management and all charges on the property; but that the trustee should not demand possession until required in writing to do so by the holders of at least one-half of all the said issue of bonds then unpaid and outstanding.  The mortgage also provided that, in case of such default and its continuance, the trustee might, after such entry, or other entry, or without entry, sell the mortgaged property as an entirety, at public auction, having first demanded of the mortgagor payment of all money then in default, and convey title to the franchises and property to the purchaser, and first pay out of the proceeds of sale all advances or liabilities of the trustee in operating and maintaining the railway and property and managing its business and affairs while in possession, and then apply the proceeds to paying, first, the interest on the bonds, and then the principal, such payment to be made on the bonds whether they should have become due or not at the time of the sale.  The mortgage also provided that, if there should be a default continuing for six months after demand for the payment of any half-year's interest, the principal of the bonds should immediately become due, and the trustee might so declare and notify the mortgagor, and, on the written request of the holders of a majority of the bonds, should proceed to

collect the principal and interest of the bonds by foreclosure and sale of the property, or otherwise, as therein provided. Up to and including Aug. 1, 1873, the Logansport Company paid the interest on the bonds. On Nov. 1, 1873, and thereafter, it failed to pay any interest.

On the 1st of January, 1873, the Logansport Company executed to the Farmers' Loan and Trust Company, a New York corporation, located at the city of New York, as trustee, a mortgage to secure the payment of bonds to the amount of $500,000, covering the entire railroad of the mortgagor, with all the property which it had or might at any time thereafter acquire in the same, extending from Logansport to Rockville, about ninety-two miles in length, with all branch roads extending from said main line, built or to be built, with the right of way, and all the property used for operating and maintaining said road and branches, whether then owned or thereafter to be acquired, and all the corporate franchises of the mortgagor. The bonds were coupon bonds, payable in gold, in the year 1903, with interest at eight per cent per annum, in gold, payable semi-annually, on the first days of July and January. The mortgage provided that, in case of default in the payment of any principal or interest, the mortgagor should, within six months after such default, the default continuing, surrender to the trustee, on its demand, the possession of the mortgaged property, and that the expense of managing the property should, if possession should be taken, be paid from the income, and, if necessary, from the sale of such personal property as the trustee might deem proper. The mortgage also contained a warrant of attorney, by which, in case of default by the mortgagor to pay any principal or interest for six months after the same should become due, it authorized any attorney or solicitor of the State of Indiana, after notice to it as thereinafter provided, to enter its appearance, without process, in any court of competent jurisdiction, to any bill filed by the trustee to foreclose and sell the mortgaged premises, and, if requested by the trustee, to consent, on behalf of the mortgagor, that a receiver be appointed forthwith, by order of said court, to take possession of said railway or any part thereof, and of all or any of the mortgaged property, on such terms as the court should

prescribe, and to consent that a decree forthwith pass for the sale of the whole or any part of the mortgaged property, without appraisement, but under the direction of the court, provided that the trustee should not demand a surrender of possession, or file a bill to foreclose and sell, unless requested in writing by the holders of a majority in interest of the bonds at par. The mortgage also provided that, in case of default in the payment of any interest for six months after the demand of payment after due, the whole principal money named in the bonds should become due, and that, in case of a sale, the proceeds should be applied, first, to paying the trustee all reasonable expenses; second, to paying the principal and interest of the bonds; and, third, to paying the surplus to the stockholders. The mortgage declared that it and its lien were subordinate to the mortgage to the Fidelity Company. The mortgagor did not pay any of the interest which fell due Jan. 1, 1874, and July 1, 1874, respectively.

On the 26th of August, 1874, the Farmers' Loan Company filed, in the Circuit Court of the United States for the District of Indiana, a bill for the foreclosure of the second mortgage, making as parties the mortgagor and the Fidelity Company and certain judgment creditors of the mortgagor. The bill set forth that the mortgage to the Fidelity Company covered the same property as the second mortgage, and that the latter was subordinate to the lien of the former. It alleged facts showing that, by the terms of the second mortgage, the entire indebtedness secured by it had become due; that a majority in interest of the holders of the second-mortgage bonds had, in writing, requested the plaintiff to foreclose the mortgage, and it had, more than thirty days before filing the bill, given notice to the mortgagor of its purpose to file the same; that the mortgagor was insolvent and unable to pay its debts; that its entire property and franchises were not equal in value to the amount of the two series of bonds; that its earnings, after paying current expenses and necessary repairs, were inadequate to the payment of interest on the two series of bonds; that the only possibility that it would in the future be able to pay the interest on the mortgage debt depended on its, or some person's, as its representative, being permitted to operate the road untram-

melled by the embarrassments under which it labored; that it had a large floating debt, partly in judgment; and that executions had been levied on the property covered by the second mortgage and used by it in the operation of the road, and such property had been carried off by the officers of the law, whereby the operations of the road had been crippled, and the expense of its management increased, whilst its revenues were diminished. The bill prayed a foreclosure of the rights of the mortgagor and of the judgment creditors, and a sale of the mortgaged property, and the application of the proceeds to the payment of the plaintiff's claims according to law. It also prayed the appointment of a receiver to take into his custody and control the mortgaged property during the pendency of the suit, to operate the railroad, receive its revenues, pay its expenses, make repairs, and manage its entire business, and any surplus revenues, after paying said expenses, to bring into court and pay out, under the order of the court, " to such persons or corporations as shall be adjudged by the court to be entitled thereto."

On the day the bill was filed the Logansport Company put in an answer admitting all the material allegations of the bill, and that the plaintiff was entitled to the relief demanded.

On the same day, on the bill and said answer, the court made an order that the Fidelity Company appear, and plead, answer, or demur to the bill on or before the first Monday of November then next, and that a copy of said order be served on it not less than thirty days prior to that day, and directing that Spencer D. Schuyler be appointed receiver, on filing a bond, to take into his custody and control the mortgaged property, and all the property of the mortgagor of every kind and wherever situate, and empowering him to operate and manage said road, receive its revenues, pay its operating expenses, make repairs, and manage its entire business, and to pay the arrears due for operating expenses for a period in the past not exceeding ninety days, and to pay into the court all revenue over operating expenses.

On the 29th of August, 1874, a copy of said order was served on the Fidelity Company, by being given to its president, and proof of such service was filed on the 31st of August, 1874.

The receiver, having filed his bond and entered on his duties, the court, on his petition, made an order, on the 23d of September, 1874, giving him leave to sell an unserviceable car and buy a new one, provided that, in the purchase, no lien should arise, for the money expended, against the interest of the first-mortgage creditors.

On the 9th of September, 1874, the receiver filed a petition representing that the rolling-stock of the road was insufficient to meet the demands of business on the same; that the line of the road was about eighty-seven miles long; that the company owned only six locomotive-engines, on one of which was a lien for its full value, and was paying a rental of $200 a month for another; that it would be for the interest of the trust for him to purchase four more locomotive-engines, and to make an adjustment in regard to the one hired and the one on which there was a lien; that the company owned only two first-class passenger-cars and one second-class, and had in use one passenger-car on lease; that it owned but one baggage-car and had one on lease; that it needed four more passenger-cars; that one of its main branches of business was transporting coal, and its rolling-stock suitable to be used in transporting coal was inadequate to meet the then demands of said business; that it owned only twenty coal-cars free from lien, and about one hundred and thirty on which there was a lien to their full value; that he ought to be authorized to make an adjustment respecting the latter and to purchase not over one hundred additional coal-cars; that the business of the road was greatly crippled for the want of such additional rolling-stock; that the company was indebted to other and connecting lines of road in about $10,000, for materials and repairs, and for ticket and freight balances; that a part of said indebtedness was incurred more than ninety days prior to the order of the court appointing him receiver and making provision for the payment of certain claims, but the payment of that class of claims was indispensable to the business of the road, and it would suffer great detriment unless he was authorized to provide for them at once; that about five miles of the road between Clymer's Station and Logansport, including a bridge across the Wabash River at Logansport, had never been built; that the city of

Logansport had recently appropriated $80,000 to aid the railroad company to build said track and bridge, which appropriation had been placed in the hands of a trustee, to be appropriated as the work progressed; and that, as the completion of said work would very largely increase the value of the property under his control, and materially aid the present and future business of the road, he asked for leave to expend such sums of money as might be necessary to complete the railway between the points named.

On the 30th of September, 1874, the receiver presented to the court a supplemental petition, setting forth that the $80,000 for building the five miles of road was raised; that the bridge would cost about $30,000; that the Detroit, Eel River, and Illinois Railroad Company, with which the receiver's road would form an advantageous connection by the building of the bridge and the five miles of road, agreed to give to the Logansport Company the one-half of the $30,000, so that that company would be the sole owner of the bridge on paying one-half of the cost of its construction; that five acres of valuable land at Logansport had been given to the Logansport Company on condition that the five miles of road should be built, said land being worth $2,500 and suitably located for a yard and shops of the company; that the total cost of the five miles of road and the bridge would not exceed $30,000 above the amounts given by the city of Logansport and the Detroit Company; that the necessary expenditure could be met by anticipating the earnings of the railway for a comparatively short time; that the increased business that would accrue to the railway by the connections made by completing said five miles of road would soon reimburse all moneys expended in constructing the same; that the building of the five miles and the bridge would be greatly to the advantage of the bondholders of the company and would add a large amount to their security, because the five miles and the bridge, when completed, would become part and parcel of the property and covered by its mortgages; that the road, without the completion of said five miles, had no terminus connecting it with other lines, but ended at a point where there was no business of importance; and that said five miles was a part of the original line of the railway and covered by both mortgages.

On the 3d of October, 1874, the court, on the said two petitions, made an order empowering the receiver to buy four new locomotive-engines, four new passenger-cars, and one hundred new coal-cars, and to make an adjustment respecting the liens on, and rentals of, rolling-stock, and to pay the indebtedness to other connecting lines for the purposes set forth in said petition, not exceeding $10,000, notwithstanding said limitation of ninety days, and to expend $30,000 in addition to said gifts and advances, to complete said five miles of road and said bridge, and to enter into the contracts required therefor.   The order provided that, as to all the moneys that might be expended, and all liabilities incurred by the receiver in carrying out the provisions of the order, the earnings of the road were charged "as with a first lien prior to all incumbrances upon said road."

On the 3d of November, 1874, the Fidelity Company filed an answer to the bill, setting up the mortgage to it and its priority to the second mortgage.   It admitted that the earnings of the road had been inadequate to pay current expenses and necessary repairs and the interest on the two series of bonds. It denied that the appointment of a manager or receiver to operate the road would enable the company to pay the interest on its mortgage indebtedness, and alleged that to appoint a manager or receiver of the road, with authority to incur expense and create fresh indebtedness, for which the road or its earnings could in any way be made responsible, would only perpetuate its past condition of embarrassment and be unjust to the respondent and the holders of the first-mortgage bonds; that the first mortgage could not rightfully, and ought not to be, affected, or its lien impaired, by any proceedings on the second mortgage; that any decree that might be made on the bill should be made expressly subject to the first mortgage; and that no order ought to be made in the cause that might or could lessen the paramount lien of the first mortgage on the property and franchises of the company, or impair the right of the holders of the first-mortgage bonds to proceed against the company when entitled so to do under the mortgage.

No further proceedings in court, of any materiality, appear to have taken place for eleven months.   On the 4th of October, 1875, the receiver filed a report and statement, showing that

he had constructed six miles of new road from Clymer's Station to Logansport, including the bridge, and had the same in running operation as a part of the main line; that the cost had been $104,651, of which he had paid and was to pay $29,015.64; and that he had purchased rolling-stock, under said order of the court, for $110,260.46, on which there was unpaid $79,536.68. On the same day he filed a petition, showing that there was due from his trust $232,000, — being $80,000 on rolling-stock, $30,000 on the five miles of road and the bridge, $25,000 for taxes, $25,000 for rights of way, $43,000 for back pay and supplies in operating the road, $20,000 for rental due to the Evansville and Crawfordsville Railroad Company for that portion of the line extending from Rockville to Terre Haute, twenty-three miles, and $9,000 to the Missouri Car and Foundry Company, on rolling-stock and in operating the road; and that $90,000 was required to place the road in proper running order. The petition prayed for authority to borrow $322,000 for said purposes, on receiver's certificates, made a first lien on the property, as for the best interest of the trust property. It set forth the grounds for asking such authority. As bearing on the interests of the first-mortgage bondholders, it contained the following statement: "The receiver went to New York City in May last, to consult with the first-mortgage bondholders, with the view of their taking some steps for the financial relief of the road. While there he met with parties holding and representing large numbers of the bonds in Boston, New York, Baltimore, Philadelphia, and other cities and their vicinities, and, as a result of his consultations with them, a meeting was advertised and held at the Fifth Avenue Hotel, in New York City, on May 24. At that meeting a committee was appointed to examine the road and ascertain its condition, its original cost, its present liabilities, and what amount would be necessary to place it in working order, &c., and to report at a subsequent meeting, to be called by the chairman. That committee afterwards inspected the road, and, at a meeting held in New York City, September 3, made their report. To that meeting the original holders of the first-mortgage bonds were each invited by timely notice, naming the time and place of the meeting, to hear the report of the com-

mittee, and to take part in the deliberations of the meeting.   A large representation of the first-mortgage bondholders was present.   A letter from the Hon. John Baird, chairman of the meeting, to the receiver, states that from $800,000 to $1,000,000 were represented.   A copy of the minutes of that meeting, duly certified by its president and secretary, together with a copy of the report of the committee previously appointed, is filed herewith. By reference to the report of that committee the court will observe that three propositions were suggested to the bondholders, viz.: 1st, Foreclosure of first mortgage and sale of the road. 2d, An assessment of not less than twenty per cent upon the par value of the bonds held by them, to pay off debts and repair the road.   3d, To devise some means for borrowing not less than $300,000.   These propositions were all fully discussed, and the discussions resulted in the passage of a resolution directing the receiver to obtain from the court authority to borrow, upon receiver's certificates, the sum of $322,000.   The receiver was present and heard the discussions, and but repeats what was there many times positively asserted, — that it would be impossible to collect, in time for the pressing necessities of the hour, an assessment of the requisite amount of money from the bondholders. Many of the bonds are held in small amounts by people of limited means, who must have a lengthy previous notice of an assessment to be able to meet it, if at all.   He would show to the court, that, as he has observed the condition of the bondholders, he believes that an immediate foreclosure of the first-mortgage bonds, or any other steps requiring the early payment of any considerable sum by the holders of bonds, would result in the complete destruction of their interests, whereas, if the court will make some present provision for these pressing necessities, their interests will be preserved to them."   Thereupon the court, on the same day, made an order setting forth that it appeared to its satisfaction that, under its orders, the receiver had purchased for the use of the road, and then had in use on it, as part of its property, rolling-stock on which there was due $79,536.68, and that there was danger of losing the property by reason of the forfeiture of the contract under which the same had been purchased, unless provision was made for the payment of that sum; and that, under its orders, he had in-

curred liabilities, in constructing and completing the five miles of road and the bridge, to the amount of $29,015.64, and that said part of the road was a part of the line of the road, and contributed materially to its value, and that there were the said amounts due for taxes and rights of way and back pay and supplies, making, in all, $201,552.32; and that it appeared that those several sums could not at that time be paid or provided for out of the current receipts of the road, and then authorizing the receiver to raise money for that purpose by issuing and negotiating receiver's certificates, due in one year from that date, bearing interest not to exceed eight per cent per annum, and payable out of the income of said road, to bearer or order, "which certificates are to be provided for by this court in its final order in said cause, unless paid by the receiver out of the income of said road as aforesaid." The order further set forth that, it appearing to the court that there were other liabilities which had accrued "in connection with the operating of said road," being the $20,000 due for rental to the Evansville Company, and the $9,000 due for rental to the Missouri Car Company, and that $90,000 was required to place the road in proper running order, and the same could not be provided for out of its income, it was, therefore, further ordered that, in case the plaintiff and the Fidelity Company, on due notice given to them of such application by the receiver, should file a memorandum therein consenting to that part of the order, or stating that they had no objections thereto, the receiver should be authorized to issue receiver's certificates and negotiate and sell them to raise money to pay said indebtedness and make said improvements, such certificates to be of like tenor and date, and to be provided for in the same manner, as those first authorized, and not to be sold or used at less than their par value. No certificates were ever issued under the second branch of this order.

On the 27th of November, 1875, the court, on the petition of the appellants in this appeal, filed on the part of themselves and all other holders of the first mortgage bonds, made the appellants parties defendant to said suit, and gave them leave to file an answer and a cross-bill. On the same day their answer was filed. It contained substantially the same allegations and deni-

als as .the answer of the Fidelity Company, and, in addition, admitted that the mortgagor was insolvent and unable to pay its debts, and that its entire property and franchises were not equal in value to the amount of the two series of bonds, and that the appointment of a manager or receiver to operate and run the road was necessary.

On the same day the appellants filed a cross-bill, on their own behalf and on behalf of all holders of the first-mortgage bonds who should choose to join in the prosecution of the suit, making as defendants the Logansport Company, the Farmers' Loan Company, the Fidelity Company, and sundry judgment creditors. The cross-bill set forth the filing and the contents of the original bill and the proceedings in the original suit, including the petitions of Sept. 9, 23, and 30, 1874, the order of Oct. 3, 1874, the report of Oct. 4, 1875, and the petition and the order of the same date. It set forth the first mortgage, and averred that, before Aug. 26, 1874, the mortgagor built a line of road from Rockville to Clymer's Station, a point between five and six miles southwesterly from Logansport, being a portion of the line contemplated by its charter and by said first mortgage, and acquired certain property which it used in constructing said road and in connection with operating it, and certain other property intended for the purpose of building the remainder of the road from Clymer's Station to Logansport, all of which were within the terms, and covered by the lien, of the first mortgage; that, since the appointment of said Schuyler as receiver, he had built and completed said line of road from Clymer's Station to Logansport, and said bridge, and had acquired a large amount of personal property connected therewith, including certain lands intended to be used for machine-shops at Logansport, and certain rolling-stock and other property for use on said railroad, and had, in so doing, used much of the property subject to the lien of the first mortgage; and that all of said property acquired by the mortgagor, and that so acquired by the receiver, and the road built by him, were equitably subject to the lien of the first mortgage. The cross-bill set forth the failure of the mortgagor to pay the interest on the first-mortgage bonds on and after Nov. 1, 1873, and averred that on and always after Oct. 20, 1873, it was

insolvent; that its entire property had not been and was not of sufficient value to pay the first series of bonds; and that its income had not been and was not more than sufficient to pay its necessary expenses incurred in operating and managing its property and making necessary and proper repairs. The cross-bill also set forth that a meeting of the bondholders was held May 24, 1875, at which the holders of a considerable number of the bonds of both series were present, and a committee was appointed to examine the road and ascertain its condition, original cost, and present liabilities, and the amount which would be necessary to place it in working order, and to report at a subsequent meeting; and that, on the 3d of September, 1875, said committee reported to an adjourned meeting its views respecting the property, to the effect that repairs and other expenditures to put the road in fair condition for use were needed, to the amount of several hundred thousand dollars; that additional rolling-stock, to the amount of $168,000, was needed for the efficient conduct of its business; that liens to the amount of $322,000, being the items above mentioned, superior in dignity to the bonded debt, existed; that there were claims against the road and the receiver aggregating $25,000; that the income of the road over actual operating expenses and repairs, for 1874, was about $20,000; and that there had been a deficit of $79,800.87 during the same time, by reason of what were called extraordinary expenses, and, during the six months next preceding July 1, 1875, a like deficit of $43,883.50, and an income of $3,000, after deducting what were called extraordinary expenses. The cross-bill averred that said statistics and statements were substantially correct, but it denied that there were any prior liens to the lien of the first mortgage. It averred that the committee in substance recommended that the first mortgage should not be foreclosed, and that the receiver should apply to the court for leave to borrow $322,000, payable in one year, to relieve the road from its present necessities, and said sum should be made a first lien upon said property, prior to the lien of either mortgage; that said report was made at the instance of said Schuyler and of the holders of the second-mortgage bonds; that the holders of first-mortgage bonds, including the plaintiffs, to the amount

of $148,700, had not consented to said scheme for borrowing money, and had joined in the cross-bill; that the plaintiffs desired, and had for more than a year last past desired and sought, to have the first mortgage foreclosed and the property sold; that they elected that the principal and interest should be due; that the Fidelity Company had refused, after request, to take measures to foreclose the first mortgage; that, under pretence of improving the property and increasing its value and earnings and acquiring additional property, the entire property was being destroyed, and liens were being attempted to be created to take precedence of the first-mortgage lien; that the Fidelity Company refused to take any means to preserve the property; that no material part of the sum of $201,552.32, which the said receiver had been authorized to borrow, could be paid from the income of the road, and it was not probable the interest on it could be paid from said income; that the borrowing of it for one year was not in the interest of the first-mortgage bondholders, and it ought not to be made a first lien upon the property; and that said Schuyler did not own any of the first-mortgage bonds, but was interested only in the second-mortgage bonds and the stock, and, for various reasons assigned, was not a proper person to have charge of the property. The cross-bill prayed for the sale of the mortgaged property to pay the first-mortgage bonds, and for the appointment of a receiver to take possession of the property and operate the road, and for the removal of Schuyler as receiver.

On the 18th of December, 1875, the plaintiffs in the cross-bill moved for a receiver thereunder and for the discharge of Schuyler as receiver. A reference to a master was ordered to take evidence on the subject.

Nothing further of importance appears to have been done in the suit until the 1st of May, 1876, when the Fidelity Company filed an answer to the cross-bill, averring that it had declined to take proceedings to foreclose the first mortgage because it had not been requested to do so by the holders of a majority of the first-mortgage bonds, and that their true interests would be best subserved by an early foreclosure of said mortgage. On the same day the Farmers' Loan Company and the mortgagor filed separate answers to the cross-bill. These answers denied

all allegations made against Schuyler in the cross-bill, and alleged that all improvements had been made in good faith, for the benefit of the property, and had added largely to its value.

On the 3d of May, 1876, the original suit and the cross-suit were brought to a hearing together on the bills and the answers therein and certain stipulations, and one decree was made in both suits, on the 17th of May, 1876, consolidating the suits, adjudging what was due on each mortgage, and declaring that the properties covered by the two mortgages were one and the same, and that the lien created by them respectively covered all the property held by the mortgagor at the time of the bringing of the original suit and all subsequent additions made thereto. The decree described said property as being the railroad from Logansport to Rockville, ninety-two miles, with all branch roads extending from said line, which had been built or acquired by the mortgagor, or for its use, with all its franchises and property which had been acquired for the purpose of operating said road and its branches, and all leases, contracts, and agreements made with the mortgagor or for its use and benefit. It declared that the lien of the first mortgage was superior to that of the second mortgage upon all of said property. It provided for a redemption of the first-mortgage lien by the second mortgagee, and, on failure, for a foreclosure of all its rights in said property except in the proceeds of a sale. It provided for the presentation before a master of claims by the holders of first-mortgage bonds and coupons, and of claims to an interest in the property, and of claims against the receiver arising out of his actings and doings as such, allowing any parties interested in the funds to be derived from a sale to dispute and contest such claims. It reserved all questions concerning priority of liens, except as between persons entitled under the first and second mortgages, and declared that it should not be necessary to pass on said claims before having a sale.

On the 25th of July, 1876, the court appointed Joseph P. Claybrook joint receiver with Schuyler in the original suit, without prejudice to the right of the plaintiffs in the cross-bill and of the Fidelity Company to claim that the receivership of Schuyler was not in their interest and by their consent, as fully

as they might have done if no such joint receiver had been appointed, and the order declared that it should not be held to entitle the first-mortgage bondholders, or their trustee, to any of the income of the property which might be realized by the receivers, until said Claybrook should qualify as receiver, or until Schuyler should requalify, which he was ordered to do by a day named. Claybrook qualified on the 11th of August, 1876, and after that acted as sole receiver, until Schuyler requalified on the 25th of August, 1876.

Under the decree of May 17, 1876, the master made reports, from time to time, as to claims, allowing some wholly or in part and rejecting some. Various questions arise on this appeal in respect to those of said claims which were allowed.

On the 20th of October, 1876, Claybrook filed a report, stating that, as receiver, he took possession, on the 12th of August, 1876, of the line of railway from Logansport to Rockville, $92\frac{87}{100}$ miles, and a line of railway from Rockville to Terre Haute, 23 miles, said to belong to the Evansville and Crawfordsville Railway Company, and $4\frac{90}{100}$ miles of side-tracks at stations between Logansport and Rockville, and a hand-railway, $1\frac{3}{4}$ to 2 miles, from Sand Creek to the coal-mines, and certain station buildings and other property, and certain rolling-stock, some owned by the mortgagor and some leased by it.

On the 22d of November, 1876, the court suspended Schuyler from his position as receiver. On the 1st of December, 1876, an order was made, on the consent of Schuyler and the plaintiffs in the cross-suit, vacating said order of suspension and accepting Schuyler's resignation as receiver, and allowing him $500 for services and expenses as joint receiver, and $15,330.29 for salary as separate receiver, without prejudice to the rights of the parties to contest any matter connected with the accounts of Schuyler as receiver, except as therein expressed, or any claims made under said accounts and asserted against said trust estate, or the claim that the receiver's indebtedness should have priority over the first mortgage.

On the 19th of February, 1877, the plaintiffs in the cross-suit filed a paper setting forth that any fund derived from the property covered by the first mortgage, or from any property acquired for the use of said railway, which was or should be

subject to the lien of said mortgage, ought not to be charged
with any indebtedness whatever, whether incurred by the mort-
gagor, or by Schuyler, as receiver, under the prayer of the orig-
inal bill; also objecting to certain items in Schuyler's account,
because credited or paid out without the authority of the court,
or upon accounts or contracts and debts which accrued or were
made and matured more than three months before Schuyler
became receiver, or because for indebtedness which Schuyler, as
receiver, had not lawful authority to incur or pay, or because
for his personal indebtedness, or unnecessary or excessive; also
alleging that the receiver's certificates and certain notes were
issued improvidently and improperly and without the authority
of the court.    Afterwards, further objections, of like tenor,
were filed to other items.   The plaintiffs in the cross-suit also
filed various exceptions to the reports of the master allowing
various claims.

On the 22d of January, 1879, after a hearing as to the
claims, on the reports, the evidence, and the exceptions, the
court made an order allowing certain claims, many of them
not over $5,000, specifying the names of the claimants and
the amounts allowed, and referring back the claim of the
Evansville Company for further evidence, and a report based on
certain specified rulings then made.   The order also contained
this provision : " All claims allowed by the court, by this order
of this day, against the receiver, are adjudged to be valid claims,
to be paid out of the funds in the possession of the court, as
well from the income of the road as from the proceeds of any sale
hereafter made, and prior in equity to any claims of the mort-
gagees of the railroad, the court reserving to the mortgagees
the right to object to any order hereafter to be made in dis-
tributing the whole or any part of the funds which may be in
court arising from the income of the railroad, or from the sale
of the same." In the order the plaintiffs in the cross-suit
prayed an appeal to this court.

On the 25th of June, 1879, the master filed a special report
as to the claim of the Evansville Company, to which, two days
afterwards, the plaintiffs in the cross-suit filed exceptions.  On
the 3d of July, 1879, the court allowed the claim at $35,318.62,
in preference to the mortgage liens.   On the same day it made

a decree for the sale, as an entirety, by the master, of the road from Logansport to Rockville, together with all the branch roads of the mortgagor extending from said main line, which had been built or acquired by it or for its use, together with all its franchises and property owned by it, or which had been acquired for the purpose of operating said road, together with all contracts and agreements made with it or for its use or benefit, giving a particular description of the property in schedules. The decree provided that, out of the net proceeds of sale, the master should pay, *first*, the costs of suit and the allowances made to the trustees and the solicitors; *second*, the taxes; *third*, the claims against the receivership and fund in court allowed by the order of Jan. 22, 1879, and the claim of the Evansville Company as so allowed, and all other claims against said receivership and fund which might thereafter be allowed, and which might remain unpaid after the funds in the hands of the receiver, not otherwise disposed of, should have been exhausted; *fourth*, the surplus to be applied, first, to the payment of the first-mortgage bonds and coupons *pro rata*, and the remainder, if any, to be distributed as the court might thereafter direct. The decree contained a prayer for an appeal from it to this court, by the plaintiffs in the cross-suit. That appeal was perfected.

This chronological history of the proceedings in the case is given, because a full understanding of those proceedings conduces to an easy solution of the questions involved in the appeal herein.

The appellees insist that the appeal should be dismissed for the alleged reason that the parties have not been named as either appellants or appellees on the docket of this court or in the transcript. But the order of Jan. 22, 1879, allows the claims, specifying the persons to whom allowed and the amounts, and the body of the order states that the plaintiffs in the cross-suit pray an appeal to this court; and the decree of July 3, 1879, orders the payment of the claims allowed by the order of Jan. 22, 1879, and contains a prayer by the plaintiffs in the cross-suit for an appeal from said decree. These were appeals in open court, not requiring citations, and the order and the decree appealed from sufficiently designated all

the appellees by name, and the appeals were appeals from the whole of the order and the whole of the decree. The decision in *The Protector*, 11 Wall. 82, does not apply to a case of this kind.

As a general proposition, applicable to the whole case, the appellants insist that the mortgagee under the second mortgage carried out a fraudulent scheme to obtain a priority over the lien of the first mortgage for the claims allowed, without giving the mortgagee under the first mortgage an opportunity to resist it until after the orders had been obtained and acted on. As evidence of this, the fact is urged that the first mortgagee was made a party to the original foreclosure suit, without any relief being asked against him. It is contended that the first mortgagee was not a proper party to the bill. The appointment of the receiver without notice to the first mortgagee, although a party to the suit, is commented on, coupled with the fact that its day of appearance was fixed as being on or before the first Monday of November then next. It is further suggested that, under the receivership originally created, the second-mortgage bondholders alone were entitled to the income from that receivership, and that the trust fund under the control of the court was only that which the second mortgagee could put there; namely, the mortgagor's right to an equity of redemption as against the second mortgagee, and not the entire property.

We see no warrant for the charge of fraud. The second mortgagee, in filing its bill, made the first mortgagee a party, though admitting the priority of the lien of the first mortgage, and not asking any direct relief against the first mortgagee, evidently because a receiver was prayed for. This was proper. Although the order of Aug. 26, 1874, appointing the receiver, was made without notice to the first mortgagee, it was served on the first mortgagee three days after it was made; and its broad terms, as to the powers conferred on the receiver, called upon the first mortgagee to appear in the suit promptly, to protect the interests of the first-mortgage bondholders, and not to wait, as it did, until the first Monday of November following. It was required by the order to appear and answer " on or before" that day. It waited until that day before appearing or answering. The original bill evinced no intention to create

a receivership for the sole benefit of the second-mortgage bond-holders.   On the contrary, it asked that the net revenue of the receivership should be paid to such persons or corporations as should be adjudged by the court to be entitled to it.   This was in substance saying to the first mortgagee that it too had an interest in the receivership.   The receiver's petitions, filed September 9 and September 30 following, respectively, were not acted on till October 3, after the first mortgagee had had ample time to appear.   These petitions showed the pressing necessity of the road.   The authority conferred by the order of October 3 was intended to benefit the *res* in the hands of the court, which was the entire mortgaged property, as covered by both mortgages, and not merely the equity of redemption of the mortgagor as against the second mortgagee.   Whatever may be the rule as to the rents and profits of a mortgaged estate, under a receivership, on a bill filed by a second mortgagee, where the first mortgagee is not made a party to the suit, that rule has not been applied to such a receivership where the first mortgagee was made a party, especially on a bill such as that in this case.   The authorities limit the exclusive right of the second mortgagee to the income of a receivership created under a bill filed by him, to a case where the first mortgagee is not a party to the suit. *Howell* v. *Ripley*, 10 Paige (N. Y.), 43; High on Receivers, sect. 688.   It is further to be observed, that, the mortgagor having defaulted in paying its interest on the first-mortgage bonds on the 1st of November, 1873, the first mortgagee was entitled, by the terms of its mortgage, to take possession of the mortgaged property and operate the road.   Moreover, the cross-bill was not filed for more than a year after the receiver had been appointed, and it was, in judgment of law or in fact, fully known all the time to the first-mortgage bondholders what was being done by the receiver in creating the claims now sought to be disputed; nor was it filed for more than a year after the first mortgagee had appeared and answered in the original suit. It was at all times competent for the first mortgage trustee, as a party to that suit, to have asked the court to protect the interests of the bondholders, in case the receiver was disregarding them; and the cross-bill could as well have been filed earlier as later by the plaintiffs in it or by other bondholders.

On these views the charge of fraud, made by the appellants, has no basis. On the other hand, it did not comport with the principles of equity for the appellants to lie by and see the court and the receiver dealing with the property in the manner now complained of, and content themselves with merely protesting generally and disclaiming all interest under the receivership, and yet assert, as they did in the cross-bill, that the piece of road from Clymer's Station to Logansport, and the bridge, and the land, and the rolling-stock, and the other property acquired by the receiver, and now alleged to have been acquired by him without authority, were subject to the lien of the first mortgage, and now claim the proceeds of all that property, without paying the debts incurred for acquiring it. A court of equity, however it might act on the question of original authority or discretion, if presented in season and under circumstances of good faith, will not visit upon innocent parties dealing with a receiver within the authority of its orders, consequences which result from the inequitable negligence and supineness of a party to the suit, or of those represented by him. The cross-bill alleges that the plaintiffs in it had desired for more than a year to have the first mortgage foreclosed.

The original bill set forth ample grounds for appointing a receiver promptly. The payment of interest on the second-mortgage bonds ceased Jan. 1, 1874. That mortgage gave a warrant of attorney for the appointment of a receiver forthwith, after six months' default, — a provision not in the first mortgage.

The order of Aug. 26, 1874, is questioned by the appellants because it empowered the receiver "to pay the arrears due for operating expenses for a period in the past not exceeding ninety days." They also object to the order of Oct. 3, 1874, because it authorized the receiver to purchase rolling-stock and to adjust the liens on rolling-stock, and to pay indebtedness, not exceeding $10,000, to other connecting lines of road, in settlement of ticket and freight accounts and balances, and for materials and repairs, which had accrued in part more than ninety days before Aug. 26, 1874, and to construct the piece of road from Clymer's Station to Logansport, and the bridge across the Wabash River, and to enter into contracts necessary

therefor, and because it provided that, as to all moneys that might be expended, and all liabilities incurred, by the receiver in carrying out the provisions of the order, the earnings of the road were charged " as with a first lien prior to all incumbrances upon said road." They also object to the order of Oct. 4, 1875, because it provided that the certificates which might be issued by the receiver under that order were to be provided for by the court in its final order in the cause, unless paid by the receiver out of the income of the road. They also object to the order of Jan. 22, 1879, because it adjudged all claims allowed by it against the receiver to be valid claims, to be paid out of the funds in the possession of the court, as well from the income of the road as from the proceeds of any sale to be thereafter made, and prior in equity to any claims of the mortgagees of the railroad. They also object to the decree of July 3, 1879, because it directed the master to pay out of the proceeds of the sale of the mortgaged property the several claims against the receivership which had been allowed by the order of Jan. 22, 1879, in preference to the amount due by the mortgagor to the holders of the first-mortgage bonds and coupons ; and because it directed the master to pay the claim of the Evansville Company, and all other claims against the receivership which might thereafter be allowed, and which might remain unpaid after the funds in the hands of the receiver, not otherwise disposed of, should have been exhausted, in preference to the amount due on the first-mortgage indebtedness ; and because it did not order that the accounts of the receiver should be adjusted and settled before the master should pay out of the proceeds of the sale of the property any of the amounts allowed as debts against the receiver ; and because it directed a sale to be made of the property covered by the first mortgage, and that acquired by the receiver, under the orders of the court, as an entire property, and did not separate the two classes of property or the funds to be realized from them respectively.

The question of the power of a court to create claims through receivers in a suit for the foreclosure of a railroad mortgage, which shall take precedence of the lien of the mortgage, was considered by this court in *Wallace* v. *Loomis*, 97

U. S. 146. There, in a suit for the foreclosure of the first mortgage on a railroad, to which the trustees of a second mortgage were parties, the court, on notice, appointed receivers, with power to put the road in repair and operate it, and complete any unfinished portions, and procure rolling-stock, and for these purposes to raise money by loan to an amount named in the order, and to issue their certificates of indebtedness therefor, which should be a first lien on the property, payable before the first-mortgage bonds. Wallace, a holder of second-mortgage bonds, afterwards became a party to the suit. The final decree declared that the moneys raised by loan, or advanced by the receivers, and expended on the road, pursuant to their order of appointment, were a lien paramount to the first mortgage, and it directed them and such receivers' certificates or other indebtedness as might thereafter be ordered by the court to be paid, to be paid out of the proceeds of the sale of the road before paying any of the first-mortgage bonds or coupons. On an appeal by Wallace, this court, by Mr. Justice Bradley, said: "The power of a court of equity to appoint managing receivers of such property as a railroad, when taken under its charge as a trust fund for the payment of incumbrances, and to authorize such receivers to raise money necessary for the preservation and management of the property, and make the same chargeable as a lien thereon for its repayment, cannot at this day be seriously disputed. It is a part of that jurisdiction, always exercised by the court, by which it is its duty to protect and preserve the trust funds in its hands. It is, undoubtedly, a power to be exercised with great caution, and, if possible, with the consent or acquiescence of the parties interested in the fund." Wallace had not become a party to the suit until several months after the order complained of was made. This court sustained the decree.

The principle thus recognized covers most of the objections here urged. The facts set forth in the petitions of Sept. 9 and 30, 1874, on which the order of Oct. 3, 1874, was based, show ample reasons for making that order, in respect to the purchase of rolling-stock, and the adjustment of liens thereon, and the construction of the Clymer Division and the bridge. The contents of those petitions have been set forth.

In respect to the $10,000 due other and connecting lines of
road for materials and repairs and for ticket and freight bal-
ances, a part of which it was stated was incurred more than
ninety days before the 26th of August, 1874, the first petition
stated that payment of that class of claims was indispensable.
to the business of the road, and that, unless the receiver was
authorized to provide for them at once, the business of the
road would suffer great detriment.   These reasons were satis-
factory to the court.   In the examination by the master of the
accounts of the receiver, evidence was taken as to the payment
by him of items due, when he took possession, for operating
expenses, and of moneys due other and connecting lines for the
matters named.   The report of the master shows that he dis-
allowed several items in the receiver's accounts, claimed under
the above heads, where the claims were made on the ground
that the creditors threatened not to furnish any more supplies
on credit unless they were paid the arrears.   His action, sanc-
tioned by the court, in allowing items within the scope of the
orders of the court, appears to have been careful, discriminat-
ing, and judicious, so far as the facts can be arrived at from the
record.   It cannot be affirmed that no items which accrued
before the appointment of a receiver can be allowed in any
case.   Many circumstances may exist which may make it
necessary and indispensable to the business of the road and
the preservation of the property, for the receiver to pay pre-
existing debts of certain classes, out of the earnings of the
receivership, or even the *corpus* of the property, under the
order of the court, with a priority of lien.   Yet the discretion
to do so should be exercised with very great care.   The pay-
ment of such debts stands, *prima facie,* on a different basis from
the payment of claims arising under the receivership, while it
may be brought within the principle of the latter by special
circumstances.   It is easy to see that the payment of unpaid
debts for operating expenses, accrued within ninety days, due
by a railroad company suddenly deprived of the control of its
property, due to operatives in its employ, whose cessation from
work simultaneously is to be deprecated, in the interests both
of the property and of the public, and the payment of limited
amounts due to other and connecting lines of road for materials

and repairs and for unpaid ticket and freight balances, the outcome of indispensable business relations, where a stoppage of the continuance of such business relations would be a probable result, in case of non-payment, the general consequence involving largely, also, the interests and accommodation of travel and traffic, may well place such payments in the category of payments to preserve the mortgaged property in a large sense, by maintaining the good-will and integrity of the enterprise, and entitle them to be made a first lien. This view of the public interest in such a highway for public use as a railroad is, as bearing on the maintenance and use of its franchises and property in the hands of a receiver, with a view to public convenience, was the subject of approval by this court, speaking through Mr. Justice Woods, in *Barton* v. *Barbour*, 104 U. S. 126. The appellants furnish no basis for questioning any specific amounts allowed in respect of the arrears referred to, but object to the allowance of anything out of the sale of the *corpus* for such expenditures. Under all the circumstances of this case, we see no valid objection to the provisions of the orders complained of.

The objections made to the orders of Oct. 4, 1875, and Jan. 22, 1879, and to certain provisions in the decree of July 3, 1879, fail, for the reasons before stated.

Specific objection is made to the allowance of the claim of the Evansville Company to be paid in preference to the first-mortgage bonds. The Evansville road ran from Rockville to Terre Haute, twenty-three miles. The mortgagor had, in June, 1872, hired that road by a written lease, the term of which was for one year and until one year's notice of its termination should be given by either party, after that term. The rent was $2,012.50 per month, and the lessee was to maintain the road in as good condition as when received, and to permit the Evansville Company to use six miles of it at a stipulated price. Provision was made, in the lease, for initial and subsequent inspection of the road, to ascertain its condition, and any improvement or depreciation the lessor or the lessee was to pay the other party for, in accordance. The lessee used the road from July 1, 1872, until the receiver was appointed. He took possession of it and ran it while he was receiver, as a

continuation of his road, and so did he and Claybrook after-wards, and subsequently Claybrook, as sole receiver, did the same. The rent was paid to Sept. 1, 1874, then for a year it was not paid, then it was paid for four months, then it was unpaid to Aug. 12, 1876, and after that Claybrook, as receiver, paid it as it accrued. During all the time from Sept. 1, 1874, the successive receivers collected from the Evansville Company, every month, $262.50 for the use of the six miles. In the winter of 1876 there was found, on inspection, a depreciation of $19,346.82. The Evansville Company made a claim against the receiver for the unpaid rent, the amount of the depreciation, the value of certain supplies, and the rent of an engine. The master reported as due $56,036.21. On exceptions, the court directed the master to ascertain what would be a fair rental value for the use of the leased property by the receivers, and to take into consideration any dilapidations. On this basis a new report, for $35,318.62, was made, and this amount was allowed, with a preference. We see no valid objection to this allowance. It is on the basis, not of the lease, but of the actual value of the use of property used by the receivers, with the clear assent, under the circumstances, of all parties interested, which use the first-mortgage bondholders and their trustee, chargeable with full knowledge, never sought to prevent, such use being founded on the lease, which was property in the hands of the mortgagor. The line was used for the benefit of the mortgagor's road and of the holders of the bonds under the mortgages, with their acquiescence. Whatever the court would have done, as an original question, if called on to determine whether the receiver should use and run the Evansville road, these appellants must now be held, in view of all the facts, to have consented to treat the right to run that road, and take its income, as if that right were a part of the mortgaged property and subject to the same rules as the other mortgaged property. This leads to the allowance, also, of the claims for operating supplies and materials, including steel rails, furnished for that road while so run.

As to the objection that the decree of July 3, 1879, was erroneous in not requiring the accounts of the receiver to be settled before any payment should be made, out of the proceeds

of sale, of any amounts allowed as debts against the receiver, the contention is, that items may yet be disallowed to the receiver, which will leave in the fund derived from income moneys applicable to pay debts incurred by the receiver, and so decrease the deficiency of income, and that the final decree of July 3, 1879, was erroneous in going beyond all prior orders, and not keeping the income separate from the proceeds of sale, and in directing the debts allowed to be paid wholly, at once, out of the proceeds of sale. This view rests entirely on the mistaken idea that the first-mortgage bondholders and their trustee had no interest in any income of the receivership created under the original bill. If hereafter there shall arise any receiver's net fund, the court must apply it to pay, in the same order of rank as in the final decree, the four sets of creditors therein mentioned, and which is the proper order, as we hold. The creditors having these claims against the receiver were *bona fide* creditors, and have waited long to receive their due. It was very proper, under the correct view of the law taken by the court below, that it should not compel them to wait longer for the settlement of the receiver's accounts, in which they have no interest.

Under the foregoing views, the objection that there was error in ordering the sale of the property as an entire property fails.

Many points were urged by the counsel for the appellants which are either disposed of under the views we have announced, or are not, though they have been considered, deemed of sufficient importance for special remark. The decree of the Circuit Court must be affirmed. In reaching this conclusion we have assumed that the appeal has brought before us the claims which are not over $5,000, and have not considered the question as to whether this is or is not a case in which our jurisdiction as to those claims could be successfully challenged.

*Decree affirmed.*