EVERETT I. WEAVER, Appellant, *v.* PACIFIC IMPROVEMENT COMPANY and CENTRAL TRUST COMPANY OF NEW YORK, as Trustee of the First Mortgage of the Central New York and Western Railroad Company, Respondents, Impleaded with the PITTSBURG, SHAWMUT AND NORTHERN RAILROAD COMPANY and Others, Defendants.

FRANK SULLIVAN SMITH, Individually and as Receiver of the PITTSBURG, SHAWMUT AND NORTHERN RAILROAD COMPANY, etc., Appellant, *v.* PACIFIC IMPROVEMENT COMPANY and CENTRAL TRUST COMPANY OF NEW YORK, as Trustee of the First Mortgage of the Central New York and Western Railroad Company, Respondents, Impleaded with HAMILTON TRUST COMPANY, as Trustee of the First Mortgage of the Pittsburg, Shawmut and Northern Railroad Company, and Others, Defendants.

CENTRAL TRUST COMPANY OF NEW YORK, Plaintiff, *v.* THE PITTSBURG, SHAWMUT AND NORTHERN RAILROAD COMPANY and Others, Defendants, Impleaded with HENRY S. HASTINGS, as Substituted Receiver of the Pittsburg, Shawmut and Northern Railroad Company, etc., Appellant; CENTRAL TRUST COMPANY OF NEW YORK, as Trustee of the First Mortgage of the Central New York and Western Railroad Company, and PACIFIC IMPROVEMENT COMPANY, as Holder of Bonds Secured by the Mortgage of the Central New York and Western Railroad Company, Each Appearing Specially, Respondents.

Second Department, November 25, 1921.

Receivers — railroads — priority of receiver's certificates over prior trust mortgages and bonds issued thereunder — decision by Court of Appeals did not determine priority — Supreme Court has power to adjust and settle rights and priorities where mortgage judgment creditor and receiver's certificate holders are represented — receiver's certificates declared prior to lien of prior mortgages where mortgage judgment creditors remain acquiescent and approve of issuance of certificates — Railroad Law, regarding railroad consolidations, does not exclude application of equity principles — coal mining ventures not necessary part of lawful operation of railroad — specific priorities declared.

In 1892 the Central New York and Western Railroad Company made a mortgage to the Central Trust Company of New York as trustee covering its line, properties, franchises, rolling stock and equipment to secure its

bonds, a large number of which came into the possession of the Pacific Improvement Company, a California corporation, controlled by Thomas H. Hubbard. In 1899 this railroad entered into consolidation with the Pittsburg, Shawmut and Northern Railroad Company, a Pennsylvania corporation having connection with mineral lands in western Pennsylvania. The consolidated corporation executed a trust mortgage covering the united properties, including coal lands, to the Colonial Trust Company of New York, as trustee, to secure its five per cent bonds. Later it executed a mortgage, in which the mining companies joined, to the Central Trust Company of New York, to secure the issue of four per cent bonds to retire the prior issue. The Hamilton Trust Company was substituted for the Colonial Trust Company as trustee. In 1905 the trustee under the four per cent mortgage began a foreclosure suit in which the president of the railroad was appointed receiver with power to continue to operate the railroad. In August of that year the receiver applied to the court on notice to the trustees of the other mortgages for permission to issue receiver's certificates and was granted such permission, without opposition, by an order which provided that said certificates were to be a lien prior to said mortgages or deeds of trust. Thereafter and in the same year the Pacific Improvement Company began a separate suit to foreclose the original mortgage. In 1906 the receiver again petitioned for permission to issue additional certificates to cover the cost of general improvements and extensions and this application was granted in part. In 1907 judgments of foreclosure were simultaneously entered in each case. Additional receivers' certificates were issued in 1909, 1910, 1914 and 1915, with the advice and approval of the president of the Pacific Improvement Company, who had purchased the first issue of certificates. In March, 1916, the first entitled action was begun by a holder of the receiver's certificates for himself and on behalf of other certificate holders, to establish the priority of such certificates. In October, 1917, the receiver began the second entitled action, in which he asked for a sale of the property, on which a prior lien was claimed for the certificates. These suits were heard together and resulted in judgments dismissing the respective complaints.

Prior to the commencement of the second foreclosure action applications were made to the Special Term of the Supreme Court for authority to issue additional certificates to meet maturing certificates which the receiver sought to make prior to the first mortgage. The Appellate Division, on an appeal from orders permitting the issuance of such certificates, reversed the Special Term, but granted the receiver leave to appeal to the Court of Appeals upon the question certified: " Had the Special Term power to determine the question of the priority of the receiver's certificates, upon the motion and the papers before it, as against the first mortgage bondholders or their trustee, named in the first mortgage?" The Court of Appeals reversed the Appellate Division, answered the question certified in the affirmative, and directed: " The cause should be sent back to the Appellate Division for it to pass

upon the merits of the controversy relating to the necessity for and advisability of renewing the receiver's certificates as prayed for in the petition and as provided by the order of the Special Term." A motion by the receiver for a rehearing in the matter of the application for receiver's certificates made after judgments were entered in the action by the holder of the receiver's certificates, and in the action by the receiver, was denied for want of power on the ground that the judgments in said actions were *res judicata.*

*Held,* that the reversal by the Court of Appeals did not determine the standing of the receiver's certificates to the amount in such orders so reinstated in favor of the receiver, but merely declared the power of the Appellate Division to examine the entire question, so as to make an equitable disposition of the opposing interests;

That, therefore, the Supreme Court is fully empowered to do equity and, in this proceeding wherein the mortgage judgment creditor and the receiver's certificate holders are represented, to adjust and settle the rights and priorities of all parties, and in seeking to do that which accords with equity and good conscience, the court cannot ignore the inference of consent and acquiescence on the part of the defendant after entry of the judgment of foreclosure; inferences further supported by the close personal connection with the railroad and the receiver by the head of the Pacific Improvement Company.

The court's orders permitting the issuance of receiver's certificates were founded on the petitions of its trusted receiver, supported by expert opinions of high authority, and without such advances the road could not have been kept running, and, therefore, said certificates may equitably outrank the lien of prior mortgages where the defendants remained acquiescent and declined to enforce their right of sale, even against certificates that on their face asserted priority over the lien of such mortgages.

The Pacific Improvement Company refrained from exercising its right of sale under its decree in the foreclosure action in concurrence with the associate interests, and, by tacit acquiescence, permitted the continued maintenance of the through service which was kept going by the issuance of the certificates, each declaring to buyers that they were taking a first lien over mortgages, and, therefore, the Pacific Improvement Company having elected, with full knowledge, to stay in the common plan to keep the road running, is estopped from now claiming that its bonds and the mortgage securing the same are entitled to priority over the receiver's certificates.

The State statute (Railroad Law [Gen. Laws, chap. 39; Laws of 1890, chap. 565], § 73; now Railroad Law, § 143) regarding railroad consolidations, providing that the respective corporations should after consolidation be deemed to continue in existence to preserve unimpaired the rights of creditors of either of such corporations, does not exclude the application of these equities from the future operation of the system.

Aside from certain coal mining ventures, not a necessary part of the lawful operation of the railroad, the part of the fund that has been expended

for general betterments, equipment and structural improvements should be considered as a charge upon the entire system of which the first mortgage covers a division.

The foreclosure decree of the Pacific Improvement Company is declared subject and subordinate to the receiver's outstanding certificates to an amount which bears the same relation to the total amount of the receiver's certificates (less the amount expended on the coal lands) as the number of miles of railroad covered by its mortgage bears to the total mileage of the entire system, and such priority is to be declared and embodied in the terms of the foreclosure sale under said decree. The residue of said receiver's certificates, exclusive of the amount expended on the coal lands, and including any amount unpaid from the Central New York and Western Railroad Company, are declared a lien upon the entire road, including mining properties.

APPEAL in the first entitled action by the plaintiff, Everett I. Weaver, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Allegany on the 15th day of March, 1919, upon the decision of the court, rendered after a trial at the Chautauqua Special Term, dismissing plaintiff's complaint upon the merits in a suit to declare a priority of certain receiver's certificates. Plaintiff sued for himself as such holder and on behalf of all other holders of such certificates. He asked a decree to subordinate the lien of certain mortgage bonds (and the judgment recovered thereon) to the lien of such certificates outstanding, amounting to $3,100,000, and also for other relief.

Appeal in the second entitled action by the plaintiff, Frank Sullivan Smith, individually and as receiver, etc., from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Allegany on the 15th day of March, 1919, upon the decision of the court rendered after a trial at the Chautauqua Special Term.

Appeal in the third entitled action by Henry S. Hastings, as receiver, from an order of the Supreme Court, made at the Erie Special Term and entered in the office of the clerk of the county of Allegany on the 20th day of November, 1920, denying said receiver's motion for a rehearing in the matter of the application for receiver's certificates.

The above appeals raise the questions of the rights of such certificate holders, and the priorities thereof over the first

mortgage, given December 15, 1892, to secure bonds issued by the Central New York and Western Railroad Company, of which issue bonds to the sum of $733,000 are outstanding. Proceedings touching this question of priority have been considered in these suits in *Central Trust Co.* v. *Pittsburgh, S. & N. R. R. Co.* (174 App. Div. 800; affd., 220 N. Y. 690; 179 App. Div. 607; 223 N. Y. 347; 189 App. Div. 921; 229 N. Y. 68) and *Smith* v. *Pacific Improvement Co.* (104 Misc. Rep. 481).

These appeals were transferred to this department from the Fourth Department of the Appellate Division. [See 193 App. Div. 968.]

*Alton B. Parker [Frank Sullivan Smith, Frederic W. Frost* and *D. D. Dickson* with him on the brief], for the appellants Weaver and Smith.

*Alton B. Parker [Arthur McCausland* and *Frederic W. Frost* with him on the brief], for the appellant Henry S. Hastings, receiver.

*Adelbert Moot [Welles V. Moot* with him on the brief], for the respondent Pacific Improvement Company.

*Arthur H. Van Brunt [Orville C. Sanborn* with him on the brief], for the respondent Central Trust Company of New York, as trustee, etc.

PUTNAM, J.:

The Central New York and Western Railroad Company, a corporation of New York organized before 1892, was later absorbed by the Central New York and Northern Railroad Company, the new consolidated company taking the name of the Central New York and Western Railroad. It had authority to build a railroad from Olean, Cattaraugus county, through Allegany county to Macedon in Wayne county. On December 15, 1892, it made a mortgage to the Central Trust Company of New York as trustee, covering its line of about ninety-two miles with a branch to Hornell in Steuben county, which branch the mortgagor operated but was not held by it in fee. It also mortgaged its railroad properties, franchises,

rolling stock and equipment, whether now held or hereafter acquired, and used or intended to be used for the construction, repairing, replacing, operation or maintenance of said railroad. A large amount of these bonds thereafter came into possession of the Pacific Improvement Company, a California corporation which the late Thomas H. Hubbard as president controlled. Thereafter, on August 1, 1899, this Central New York and Western Railroad entered into consolidation with the Pittsburg, Shawmut and Northern Railroad Company, a Pennsylvania corporation having connection with mineral lands in western Pennsylvania. Its name was taken by the consolidated company. It had an authorized capital stock of $12,000,000 par value. It delivered a mortgage on all the united properties, including coal lands, to the Colonial Trust Company of New York as trustee to secure $12,000,000 five per cent bonds. Later it sought to refund these bonds at a lower rate. It then gave a further mortgage on its railroad and mining interests for $15,000,000, in which the mining companies joined, to the Central Trust Company of New York, to secure an issue of four per cent bonds to retire the prior issue. This was nearly accomplished, leaving outstanding only $164,000 of the five per cent bonds. Later the Hamilton Trust Company was substituted for the Colonial Trust Company as trustee under the five per cent mortgage. The plan also to take up and retire the first issue of bonds of the Central New York and Western Railroad Company failed on account of the inability of the banking house, which had undertaken this arrangement, so that the Pacific Improvement Company remained the holder of 650 of these bonds. During a part of the time from 1902 to 1905 this consolidated railroad property was operated at a loss, and the value thereof depreciated.

On August 1, 1905, the Central Trust Company of New York, as trustee under the $15,000,000 four per cent mortgage of the Pittsburg, Shawmut and Northern Railroad Company, and the subsidiary mining companies, dated February 1, 1902, began a foreclosure suit in the Supreme Court for Allegany county. In this proceeding the president of the railroad company, Frank Sullivan Smith, was appointed receiver. This order of appointment directed the receiver as officer of the

court " to continue to operate the said mortgaged property in the same manner as at present conducted, and in all respects perform and fully discharge the duties owed by said Railroad Company as a public carrier of passengers and freight." By a petition of August 17, 1905, the receiver set forth the need for payments for bridges, side tracks, stations, both for freight and for passengers, also for taxes, and rentals for equipment. This was served with notice of the application upon the attorneys for the Central Trust Company and the Hamilton Trust Company, who made no opposition to such application. Whereupon the leave was granted by order of August 21, 1905, which gave authority to issue certificates to the amount of $200,000. The court fixed the form of such certificates. In them was recited " due notice to said Central Trust Company of New York and Hamilton Trust Company of Brooklyn, N. Y., as trustees under the several mortgages or deeds of trust upon the mortgaged property of said defendants in said above entitled action." Then followed these words of assurance:  " Said certificates are made by orders of said Courts to be a debt by said receiver for the benefit, preservation and protection of the mortgaged property of said defendants in said action and of the creditors and holders of the stock and bonds of said railroad company, and to be a lien upon said property and the net receipts, income and profits thereof prior to the lien of said mortgages or deeds of trust or any of them heretofore created upon said property and are to be recognized as such in any reorganization of said defendants or in case of any sale of said mortgaged property by judicial procedure or otherwise." And the later issues of receiver's certificates were drawn in this form. A like order followed in the Federal court for the Western District of Pennsylvania. This petition and issue of certificates were by the advice of Thomas H. Hubbard, president of the Pacific Improvement Company and owner of half of the stock thereof.

When it was sought to foreclose the first mortgage, the trustee named, the Central Trust Company of New York, on account of its relation to the foreclosure of the $15,000,000 mortgage, declined to act. Therefore, on November 2, 1905, the Pacific Improvement Company began a separate suit to foreclose such original mortgage given by the Central New

York and Western Railroad Company under which 733 bonds, each of the denomination of $1,000, were outstanding. Of these the Pacific Improvement Company held 650 and Mr. Frank Sullivan Smith individually 83. There were joined as defendants the mortgagor, the Central New York and Western Railroad Company, the Pittsburg, Shawmut and Northern Railroad Company, Frank Sullivan Smith, as receiver, and the Central Trust Company of New York.

On February 20, 1906, the receiver again petitioned the court for leave to enlarge the railroad bed, tracks, stations and bridges, as a means to increase its traffic capacity in connection with mining interests in Pennsylvania. The projected improvements were outlined in a report by Mr. J. T. Odell, an experienced civil engineer, made in the fall of 1905. A copy of this report had been circulated among creditors and bondholders of the road, also to holders of receiver's certificates of earlier issues. The purposes were to reduce grades, remedy the excessive curvatures, so as to handle the volume of traffic expected. His conclusions were indorsed by Mr. William Barclay Parsons, an engineer of large experience. The court at first granted certificates for $3,800,000, which on a creditor's application was reduced to $1,100,000, in addition to the prior $200,000.

On May 9, 1907, judgments of foreclosure were simultaneously entered in each case. The conditions of sale, however, differed. That for the second mortgage was to be subject to the receiver's outstanding obligations which the purchaser was to assume. The Pacific Improvement Company decree declared plaintiff's mortgage a first lien subject to taxes. Yet at this time there were outstanding receiver's certificates amounting to $822,000. These were clearly liens, and it is difficult to see how they had been cut off by this decree, since these holders were unrepresented in this foreclosure. Such were the facts as to these foreclosure decrees that thenceforward were to lie dormant pending these efforts to rehabilitate this railroad system.

In April, 1909, the receiver obtained leave to issue further certificates amounting to $1,600,000 for the following objects: $822,000 to take up maturing certificates, $248,000 used as collateral for receiver's notes (because his certificates had not

been sold), also $450,000 to complete a link in the system of about twelve miles from Caryville, N. Y., to Pennsylvania State line; $25,000 for improvements at North Fork, Penn.; and $58,000 to meet obligations upon coal lands in Pennsylvania. Further orders were similarly granted on June 25, 1910, for $1,500,000, and on April 25, 1914, for $525,000; and July 3, 1915, for an issue of $1,700,000. The total sum outstanding, as already stated, was $3,100,000.

The learned court at Special Term has found that the receiver has expended under orders of said courts approximately $4,000,000 for additions and betterments; that at the time of the appointment of such receiver, the cost of operation of the railroad exceeded the earnings by five per cent, whereas in December, 1915, the cost of such operation was only 63.6 per cent of net operating revenue, which ratio had continued in March, 1916.

It otherwise appears that of the proceeds of these receiver's certificates, a considerable portion was expended on mining properties, in addition to coal required for purposes of railroad operation.

The attempt to amend *nunc pro tunc* the petitions for leave to issue previous certificates having failed by the reversal in the Appellate Division (*Central Trust Co.* v. *Pittsburgh, S. & N. R. R. Co.*, 174 App. Div. 800), independent proceedings were taken to settle such priorities. On March 27, 1916, Mr. Weaver for himself and on behalf of other certificate holders brought suit to establish the priority of such certificates. Before 1917 the applications to issue receiver's certificates had been without formal notice to the Pacific Improvement Company. However, on May 4, 1917, the receiver petitioned the court for leave to issue such certificates to the amount of $525,000 to meet his certificates then about to mature. A copy of such petition, also seeking to establish a priority over the bonds issued under the Central New York and Western Railroad Company mortgage, with notice of its presentation, was served upon the Pacific Improvement Company, who appeared specially and objected to the court's jurisdiction to order the issue of any such certificates to the prejudice of its judgment. The application was granted by the Special Term of Allegany county on May 19, 1917. About July 11, 1917, the receiver again presented a like

petition to issue certificates to the amount of $1,700,000 to meet maturing certificates, which he also sought to make prior to the first mortgage. A copy of the petition and notice of presentation to the Supreme Court was also served upon the Pacific Improvement Company, and the like proceedings and orders followed that of May 19, 1917. Thereupon appeals from these orders were taken to the Appellate Division, Fourth Department. That court on October 20, 1917, reversed the Special Term. It, however, granted the receiver leave to appeal to the Court of Appeals upon the question certified: " Had the Special Term power to determine the question of the priority of the receiver's certificates, upon the motion and the papers before it, as against the first mortgage bondholders or their trustee, named in the first mortgage? " This appeal resulted in favor of the receiver. The order of the Appellate Division was reversed, and the question certified answered in the affirmative. The court thus directed: " The cause should be sent back to the Appellate Division for it to pass upon the merits of the controversy relating to the necessity for and advisability of renewing the receiver's certificates as prayed for in the petition and as provided by the order of the Special Term." (223 N. Y. 347, 365.) In October, 1917, Mr. Smith, as receiver, also began suit, asking a sale of the properties, on which a prior lien was claimed for the certificates. These suits were heard together at Allegany County Special Term, and resulted in judgments on March 15, 1919, for the Pacific Improvement Company and the Central Trust Company, with dismissals of the respective complaints. Plaintiffs both appealed to the Appellate Division of the Fourth Judicial Department. The receiver applied on August 26, 1920, for a rehearing in the matter of the application for receiver's certificates, pointing out that his expenditures for betterments had not been made proportional to different sections of the road, or to different mortgage liens, or other interests involved, but were made solely with the view of urgent needs of the entire property under the receiver's administration. That the purpose of buying equipment, development of coal lands and other expenditures mentioned, in so far as they had any purpose of benefit to any special section of the road, was to save the central New York and

western portion,' since that portion was without any sub-
stantial traffic except as supplied by the development of the
southern end of the system.   That as the Pacific Improvement
mortgage and judgment covered approximately thirty-seven
per cent of the entire railroad mileage, the receiver suggested
that certain general outlays for betterments and operation of
the road might be thus apportioned upon that basis.   As the
printed records in the original suits had in the meantime
appeared, this application for rehearing was amended so as to
include as a basis for the motion these printed records in the
*Weaver* and *Smith* cases.   At this hearing it was apparently
held that such judgments were *res adjudicata*, so that the
petition for rehearing was denied for want of power.   From
such order the substituted receiver, Henry S. Hastings, duly
appealed to the said Appellate Division.   Thereafter that
court transferred the above appeals to this court.

It has been strongly contended that this Court of Appeals
reversal, notwithstanding the explicit terms of the decision,
has determined the standing of such receiver's certificates
to the amount in such orders so reinstated in favor of the
receiver.   It seems to us that it declared the power of
the Appellate Division to examine the entire question, so
as to make an equitable disposition of the opposing interests —
a power which it clearly affirmed notwithstanding the Pacific
Improvement Company judgment.   Hence no special finding
is made regarding these two attempted issues of certificates.
We consider the entire amount outstanding.

Under the conclusion of the Court of Appeals and its clear
and distinct instructions, the Supreme Court is fully empowered
to do equity and, in this proceeding wherein the mortgage
judgment creditor and the receiver's certificate holders are
represented, to adjust and settle the rights and priorities
of both parties.   In seeking to do that which accords with
equity and good conscience, the court cannot ignore the
inference of consent and acquiescence after entry of this
judgment of foreclosure, inferences further supported by the
close personal connection with the railroad and this receiver
by the head of the Pacific Improvement Company.   Referring
to him, the late Judge CHASE significantly said: " The person
who was the president of the Pacific Improvement Company

(owner of the remaining $650,000 of said bonds) until his death in May, 1915, saw and approved all the orders authorizing the receiver to issue certificates of indebtedness made prior to his death, and he also purchased and paid for the first $200,000 of receiver's certificates issued by the receiver and which certificates expressly recited that they were a first and prior lien on all the property of the corporation." (*Central Trust Co.* v. *Pittsburg, S. & N. R. R. Co.*, 223 N. Y. 347, 361.) In the last utterance by that court, Cardozo, J., said that the Appellate Division "was under no duty to direct its own officer to issue certificates that would have priority over underlying mortgages while its mind and its conscience were unsatisfied that justice would thus be done. It would not command its representative ' to do a shabby thing ' (*Ex parte Simmonds*, L. R. 16 Q. B. 308). It might desire information that would show in greater detail the application already made by the receiver of moneys borrowed on certificates. It might find itself unable to determine the equities of prior bondholders without a fuller showing of the extent to which such application had resulted to their benefit." (229 N. Y. 68, 71.)

There is the weighty consideration looking to the effect and legal value of such court borrowings, going forth sanctioned by the receiver's certificates reciting the high priority under a court order. Such loans to a railroad under judicial protection having the purpose to serve public convenience by preventing its stoppage, as well as to preserve its franchise, are not to be displaced upon the wisdom that comes after the event, even if, in retrospect, it appears that the road has not reaped the future advantages looked for. The court's orders were founded on the petitions of its trusted receiver, supported by expert opinions of high authority. Without such advances the road could not have been kept running. Such avails may equitably outrank the lien of a prior mortgage, where such defendants remained acquiescent and declined to enforce their right of sale even against certificates that on their face asserted priority over the lien of such mortgages.

The application of such proceeds was to the entire consolidated road, and upon its subsidiary coal interests. At the dates of many of these issues it had been operated about

ten years as a single corporate unit, engaged in interstate commerce. The defendants' interest in this united system, having been reduced to a judgment, could have been easily sundered had that seemed a better course. By simply going forward with a sale, under its foreclosure decree, the Pacific Improvement Company could have dismembered the through line and secured satisfaction on the part covered by its mortgage. It refrained from this step in concurrence with the associate interests, and, by tacit acquiescence, permitted the continued maintenance of the through service, which on this record was kept going by these certificate issues, each declaring to buyers that they were taking a first lien over mortgages. The court as well as the stock and lien holders of a railroad regard the advantage of keeping up such union of railroad lines to be operated under a single and coherent management. (*Union Trust Co.* v. *Illinois Midland Co.*, 117 U. S. 434, 468.) The purchase of rails to improve a mortgaged road was held to be " incurred in the interest of mortgage creditors, the value of whose securities depended upon the unity of the Danville system being preserved and the interests of all concerned not allowed to go to ruin." (*Southern Railway* v. *Carnegie Steel Co.*, 176 U. S. 257, 289.) In *Horton* v. *McNally Co.* (168 App. Div. 248, 252) this court declared that a judicial assurance by a recital of the certificates to the public, which is thereby induced to buy such certificates, is not lightly to be withdrawn. (See, also, *Bank of Commerce* v. *Central Coal & Coke Co.*, 115 Fed. Rep. 878.) The whole tenor of the opinion of the late Judge CHASE (223 N. Y. 347, 363) looks to the high duty to the public to keep up continued operation and avert the evils of a sudden shut down in transportation. (See 2 Tardy's Smith Receivers [2d ed.], § 541.) The duty of a receiver is not limited to the original road, but may justify building a needed addition. In *Miltenberger* v. *Logansport Railway Co.* (106 U. S. 286) such an order for the receiver to build five miles of new road, and even a bridge across the Wabash river, was held justified.

The Pacific Improvement Company, with full knowledge, elected to stay in the common plan to keep the road running. It had actual notice of these applications for issue of certificates. (223 N. Y. 364.) While it appears that some of

these proceeds provided needed stations and bridges upon the line covered by this first mortgage, even that benefit was of less moment to the defendant than that general expenditure which maintained the whole line as a united transportation system. (*Union Trust Co.* v. *Illinois Midland Co., supra.*) In *Miltenberger* v. *Logansport Railway Co.* (106 U. S. 286, 308) the court said: "A court of equity, however it might act on the question of original authority or discretion, if presented in season and under circumstances of good faith, will not visit upon innocent parties dealing with a receiver within the authority of its orders, consequences which result from the inequitable negligence and supineness of a party to the suit, or of those represented by him." Laches in not bringing suit is far less than the case of having obtained a judgment of foreclosure and sale, and then letting it drop, while the system as a whole is being carried by loans under court orders. The State statute regarding railroad consolidations (Railroad Law [Gen. Laws, chap. 39; Laws of 1890, chap. 565], § 73); now Railroad Law [Consol. Laws, chap. 49; Laws of 1910, chap. 481], § 143), which provided that the respective corporations should after consolidation be deemed to continue in existence to preserve unimpaired the rights of creditors of either of such corporations, in our view does not exclude the application of these equities from the future operation of the united system. The consolidation and the new reconstruction did not abridge the rights under the Pacific Improvement Company's judgment. It could at once sell the mortgaged line with the accessories covered by the decree. If it elected to hold this judgment in abeyance, and stand aside, while that section of the united road was being renewed and its facilities enlarged, it manifestly subjected the judgment and the bonded interest thereby secured to the resulting equities from the acceptance of such benefits and increments to the mortgage security. Hence we cannot give this statute the wider negative effects ascribed to it by the learned court at Special Term (104 Misc. Rep. 481, 491), namely, that it excluded the application of such recognized equities as against the acquiescent holders of prior mortgage securities. However, we are not prepared to advance all these borrowings by the receiver above the lien of defendant's

judgment. Investments in coal mining companies, though then a common practice with railroads entering these coal regions, were not a necessary part of the lawful operation of this line engaged in interstate traffic. This was clearly objectionable after the Commodity Clause of the Hepburn Act or Railroad Rate Act of June 29, 1906 (34 U. S. Stat. at Large, 585, § 1, amdg. Interstate Commerce Act [24 id. 379], § 1),* which declares it unlawful from and after May 1, 1908, for any railroad company to transport in interstate commerce " any article or commodity, * * * mined, or produced by it, or under its authority, or which it may own in whole, or in part, or in which it may have any interest direct or indirect." (See *United States* v. *Delaware, Lackawanna & Western R. R.*, 238 U. S. 516; *United States* v. *Reading Co.*, 253 id. 26.) But aside from these coal mining ventures, the part of this $3,100,000 that has been expended for general betterments, equipment and structural improvements, should be considered as a charge upon the entire system of which this first mortgage covers a division. This may be fairly apportioned against the part covered by the Pacific Improvement Company judgment in the ratio or mileage proportion of its mortgaged line to the total operated road as a prior charge and lien over the first mortgage bonds and judgment.

However, we have not found in the decision a finding or basis to show what part or proportion of these $3,100,000 outstanding certificates represents outlays for acquiring coal lands, coal mining operations, and in payment of liens and charges on such properties. If such amounts cannot be supplied by stipulation, the cause may have to be sent back for proper ascertainment of these separate outlays.

The final disposition of these appeals, therefore, awaits a stipulation showing the coal outlays represented in the outstanding certificates, which stipulation should be presented within ten days.

BLACKMAR, P. J., MILLS and JAYCOX, JJ., concur; KELLY, J., in the result.

---

* Since amd. by 36 U. S. Stat. at Large, 547, § 7, and 41 id. 475, 476, § 401, being Federal Transportation Act, 1920.— [REP.

The mortgage bonds and the judgment of the Pacific Improvement Company are held subject to a priority for a proportionate part (based upon mileage) of the outstanding receiver's certificates excepting so much of the certificate proceeds as represents coal lands and mines. Final decision reserved to permit the filing of a stipulation within ten days, showing how much of the $3,100,000 receiver's certificates represents such coal outlays.

The following supplemental opinion in the first two appeals was handed down on the 23d day of December, 1921:

PUTNAM, J.:

This court on November 25, 1921, handed down a decision holding the bonds and the judgment of the Pacific Improvement Company subject to a priority for a proportionate part (based upon mileage) of the outstanding receiver's certificates excepting so much of the certificate proceeds as represents coal lands and mines. Final decision was reserved to permit the filing of a stipulation to show how much of the $3,100,000 represents such coal outlays. (See 198 App. Div. 825.) Such stipulation, dated December 9, 1921, was filed on December nineteenth, showing the total expenditures of the receiver in acquiring coal lands, coal mining operation and paying liens and charges on such properties aggregate (including $5,000 expended on the so-called Osterhoudt bonds due June 15, 1907) the sum of $368,532.63. The court can now make these findings:

I. The total expenditures of the receiver in acquiring coal lands, coal mining operations and paying liens and charges on such properties aggregate (including $5,000 expended on the so-called Osterhoudt bonds due June 15, 1907) the sum of $368,532.63, which being deducted from $3,100,000, the full amount of the outstanding receiver's certificates, leaves $2,731,467.37 to be apportioned against the lien of the Pacific Improvement Company judgment in the ratio of the relative mileage of the railroad covered by its mortgage and foreclosure judgment (92 miles) to the mileage of the entire system operated by the receiver (289.37 miles), being .31793 per cent,

which would make $868,415.42* as the part of such certificates apportioned upon the railroad mortgaged by the Central New York and Western Railroad Company to the Central Trust Company of New York, and included in the foreclosure judgment recovered by the Pacific Improvement Company on May 9, 1907.

II. That the joint and continued operation of the entire system by the receiver under the orders of the court, and the benefits to the whole line, with the ninety-two miles thus mortgaged and included in the foreclosure decree, make it equitable and fair that said sum of $868,415.42, representing the proportion of such outlays, should have priority over said judgment, which by its foreclosure could at any time have separated and dismembered the entire system in the receiver's hands.

III. That the president of the Pacific Improvement Company, Thomas H. Hubbard, advised with Frank Sullivan Smith, the receiver, as to applying for the issue of receiver's certificates and approved the forms of the petitions orders and certificates to be issued.

IV. This court reverses and rescinds the following nine findings of the learned court at Special Term herein, dated March 1, 1919; namely, findings numbered forty-eight (48), one hundred and sixty-five (165), one hundred and sixty-six (166), one hundred and sixty-seven (167), two hundred and thirty-two (232), two hundred and sixty-three (263), two hundred and sixty-seven (267), two hundred and seventy-four (274) and two hundred and seventy-five (275).

Accordingly judgment will be directed:

*First.* That the foreclosure decree of the Pacific Improvement Company be declared subject and subordinate to the receiver's outstanding certificates to the aforesaid amount of $868,415.42, also that such priority should be accordingly declared and embodied in the terms of foreclosure sale whenever the same shall be sold under said decree.

*Second.* Therefore, the following will be the order of priori-

---

* On settlement of the final decree, it appeared that the Pacific Improvement Company mortgage covered 75.37 miles out of 204.67 miles, the total line operated by the receiver. Hence the ratio was .3682, so that the certificates to amount of $1,005,726.29 were preferred, instead of the sum stated in the opinion.— [NOTE BY THE COURT.

ties: On the Central New York and Western Railroad Company, first in rank, certificates issued by the receiver to the sum of $868,415.42; second, the judgment of foreclosure of the Pacific Improvement Company. That the residue of such certificates, including any amount unpaid from the above Central New York and Western Railroad Company, are declared a lien upon the entire road, including mining properties.

The judgments of the Special Term of Allegany county are, therefore, reversed, without costs, and judgment directed in each case in accordance herewith, without costs.

BLACKMAR, P. J., MILLS, KELLY and JAYCOX, JJ., concur.

In each case: Judgment of the Special Term of Allegany county, with certain findings of fact, reversed, without costs, and new findings made, and judgment directed declaring priority in accordance with the supplemental opinion by PUTNAM, J., without costs. Settle judgment on notice on December 29, 1921, at 11 A. M

The following opinion in the third appeal was handed down on the 23d day of December, 1921:

PUTNAM, J.:

While the learned court at Special Term rightly considered that the prior judgments of the Special Term in causes *Weaver* v. *Pacific Improvement Co.* and *Smith* v. *Pacific Improvement Co.* were a bar to his granting the relief sought, this court having reversed said judgments now grants to appellant the authority to reissue and exchange at par for like outstanding and overdue certificates of indebtedness by the receiver herein, in the aggregate amount of $3,100,000, such certificates to have the priorities and respective liens as are now declared in the opinion upon the appeals from such judgments.

BLACKMAR, P. J., MILLS, KELLY and JAYCOX, JJ., concur.

Order of the Special Term of Allegany county modified by authorizing the reissue of the certificates as prayed for, with priorities, as declared in *Weaver* v. *Pacific Improvement Co.* (198 App. Div. 840) and *Smith* v. *Pacific Improvement Co.* (Id.), decided herewith, without costs. Settle order on notice on December 29, 1921, at 11 A. M.