RUHLENDER v. CHESAPEAKE, O. & S. W. R. CO. et al.   CARNEGIE.
STEEL CO., Limited, v. SAME.   HARRIMAN v. SAME.

LLOYD et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit.   November 9, 1898.)

Nos. 562–565.

1. APPEAL—CIRCUIT COURT OF APPEALS—REVIEW OF QUESTIONS OF FACT.
A finding by a commissioner on a disputed question of fact, in which the
court has concurred, will be accepted by the circuit court of appeals, in.
the absence of cogent evidence of mistake.

2. RAILROADS—INSOLVENCY—PREFERENTIAL LIENS FOR EQUIPMENT.
Where steel rails were sold to an individual, on his own credit, for the
lessee of a railroad, the seller is not entitled to a preferential lien therefor
on the property of the lessor.

3. SAME—RIGHTS OF GENERAL CREDITORS.
A receivership of a railroad, though obtained in a suit in behalf of gen-
eral creditors, does not entitle such creditors to payment from the earnings
under the receivership in preference to claims usually denominated "debts
of the income," and which are preferential charges thereon as against all
other creditors; and a payment of such debts by the receiver is not a di-
version of assets which gives general creditors the right to have the
amount of such payments restored from the corpus of the property, as
against mortgage creditors.

4. SAME—PAYMENTS BY RECEIVERS.
Where the complainants themselves obtained orders directing the re-
ceiver of a railroad to pay interest to prevent the maturing of liens on
the property, they cannot object that subsequent payments ordered con-
stituted an improper diversion of the income.

Appeals from the Circuit Court of the United States for the District
of Kentucky.

On December 22, 1893, the original bill of Collis P. Huntington against the
Chesapeake, Ohio & Southwestern Railroad Company, with the answer of the.
defendant, were presented to the circuit judge, and motion made for the ap-
pointment of receivers under the bill.   Defendant was incorporated under the
laws of the states of Kentucky and Tennessee.   On the same day the com-
monwealth of Kentucky appeared by counsel, and made application to be ad-
mitted as a party defendant for the purpose of resisting the appointment of
receivers.   Both motions were continued until December 28, 1893, when the,
bill was for the first time actually marked "Filed" by the clerk.   There was
the necessary diverse citizenship of the parties to this bill, and the court had
undoubted jurisdiction.   On December 28th Huntington presented an amended
and supplemental bill, bringing in as defendants Lloyd and Hawes. as trustees,
in a second mortgage executed by the defendant company.   In this amended
bill Huntington alleged that he was owner of a majority of the second mort-
gage bonds, and holder of past-due interest coupons aggregating a large sum,·
to satisfy which it was sought to have the second mortgage foreclosed.
The original bill was a representative general creditors' bill, filed on behalf
of all creditors who might come in under the usual equity rules.   Under the
bill, as amended, receivers were appointed, and put in possession of the rail-
road property, with directions to operate the same under orders of the court.
By the decree the receivers were directed, in their discretion, from time to
time, "out of the funds coming into their hands, to pay the expenses of oper-
ating the said property and executing their trust, and all taxes and assess-
ments upon said property, or any part thereof, and all such rentals and in-
stallments as may fall due or be due for the use of any portion of said rail-
road and other property, or for any rolling stock or equipment heretofore
furnished to said company, and partially paid for, and also to pay any and
all amounts due from said company to employés in its business, and to persons

who supplied materials and supplies for carrying on of said business." In the amended bill by Huntington the citizenship of Lloyd and Hawes, trustees in the second mortgage, was not alleged or shown, but it subsequently appeared from other parts of the record that Hawes was a citizen of the same state with complainant Huntington. January 19, 1895, an original foreclosure bill by Lloyd and Hawes, trustees in the second mortgage, was filed against the Chesapeake, Ohio & Southwestern Railroad Company, seeking foreclosure of that mortgage, subject to the lien of the first mortgage, and the original receivership under the Huntington bill was extended to this bill from and after date of filing. The cases were consolidated, and a new set of books were opened, in order to preserve the distinction between the accounts and earnings up to that time and those made and arising thereafter. The receivership up to this date is called the "first receivership." Creditors and lien claimants intervened, and the usual references were had, with reports. The property was sold, and decree made for distribution of the proceeds; and this record presents for consideration appeals from that decree by intervening petitioners, and by the purchaser and trustees in the mortgage foreclosed.

A. P. Humphrey, for Carnegie Steel Co.
Edward F. Trabue, for E. H. Harriman and Lloyd & Hawes.
Wm. Marshall Bullitt, for Henry Ruhlender.

Before TAFT, Circuit Judge, and SEVERENS and CLARK, District Judges.

CLARK, District Judge, after making the foregoing statement, delivered the opinion of the court.

We do not understand that the assignments of error by the purchaser and trustees require serious or particular discussion. Manifestly, they cannot be sustained, and may be dismissed without further attention.

We now examine the claims presented by the appeals of Ruhlender and the Carnegie Steel Company, Limited, in their order.

Ruhlender recovered judgment in the state court against the Chesapeake, Ohio & Southwestern Railroad Company for $50,000, besides interest, and caused execution to be issued thereon, which was on the 30th day of June, 1894, levied on certain parcels of land owned by the railroad company, known as the Hospital and River Front properties, situated in Paducah, Ky.; the property being at the time in the possession of the receivers appointed under the Huntington bill. Thereupon Ruhlender filed his intervening petition in the Huntington case and in the consolidated foreclosure suit; claiming a first or prior lien on the property levied on, by virtue of the execution levy. Ruhlender's judgment was allowed as a general debt against the Chesapeake, Ohio & Southwestern Railroad Company, but the decree was against the contention that a prior lien was acquired by the levy; the court holding that the levy was void, because the property was at the time in the possession of the receivers, and, further, that this property was covered by, and subject to, the lien of the second mortgage. For appellant Ruhlender, it is insisted that no suit was instituted until December 28, 1893, when the Huntington bill was marked "Filed," and when the trustees in the second mortgage were made parties defendant by amendment, and that for the want of the requisite diverse citizenship the court was without jurisdiction, and the appointment of receivers and all proceedings void, until the foreclosure bill of Lloyd and Hawes was filed, January 19, 1895, after which it is conceded that the court had

jurisdiction. The further contention is that the lots levied on were not covered by the second mortgage, and were subject to levy. The lots were purchased after the execution of the mortgage. In the description of the property conveyed, the mortgage contains language as follows:

"And the lands, real estate, leaseholds, easements, and other rights or interests in or pertaining to lands, * * * and appurtenances thereunto belonging or in any wise appertaining, whether now owned and possessed, or hereafter to be acquired, used, or intended for use for the purpose of, or in connection with, the said railroad, or the operation or maintenance thereof, * * * and all the franchises, rights, and all other the corporate property, real and personal, of said railroad company, belonging or appertaining to the said railroad, whether heretofore acquired, and now held or owned, or hereafter to be acquired, by the said railroad company, or at any time used, or designed to be used, in or upon, or in connection with, the said railroad; * * * all lands acquired or designed for depots, warehouses, structures, and side tracks, at either terminus, or along the line of said railroad, whether now held and owned, or hereafter to be acquired, by the said railroad company, or for use in connection with said railroad; and all continuations, branches, tracks, or extensions of said railroad to such depots, warehouses, and structures."

The real point of the contention is not that the terms of the second mortgage are not sufficiently broad to include this property, but that these lots were not property "used or intended for use" in connection with the railroad itself. Proof was properly admitted as to the purpose for which the lots were purchased, and the special master found that the lots were acquired for use in connection with the railroad, and his conclusion in this respect was concurred in by the court. Under such circumstances, in the absence of cogent evidence of a mistake of fact or error of law, the finding will be accepted by this court. Belknap v. Trust Co., 47 U. S. App. 663, 26 C. C. A. 30, and 80 Fed. 624; Emil Kiewert Co. v. Juneau, 47 U. S. App. 395, 24 C. C. A. 294, and 78 Fed. 708; Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237; Crawford v. Neal, 144 U. S. 585, 12 Sup. Ct. 759; Salt Co. v. Brigel, 30 C. C. A. 415, 86 Fed. 818. We find nothing in the record which would authorize us to disturb the decree upon this ground. Agreeing as we do with the circuit court in the conclusion that these lots passed under the after-acquired property clause of the second mortgage, and that the lien claimed for Ruhlender was properly denied on this ground, we do not find it necessary to consider or determine the question made as to the jurisdiction under the Huntington bill.

We now come to the questions presented under the appeal of the Carnegie Steel Company, Limited. This company, in its petition of intervention, asserted a preferential claim of $147,000, being the aggregate amount of five separate notes given for steel rails sold and delivered during the years 1892 and 1893. The entire claim was rejected by the special master. At the hearing, counsel for the petitioner conceded that recovery could not be had on the two notes given for the rails sold in 1892. On exceptions to the master's report, the claim was allowed by the court as a general or unsecured debt to the extent of $87,771.22; being the aggregate amount of the notes for rails sold and delivered in 1893. The Chesapeake, Ohio & Southwestern Railroad Company was organized, as we have seen, as a corporation, under the

laws of the states of Tennessee and Kentucky, and on January 29, 1886, leased its railroad and railway property to the Newport News & Mississippi Valley Company, a corporation organized under the laws of the state of Connecticut. The lease was for the term of 50 years, beginning February 1, 1886, and the lessee company entered into possession and operated the railroad until July 31, 1893, when the lease was canceled by agreement, and the lessor restored to the possession of the property. The steel rails sold by the petitioner and delivered during the year 1893 were purchased by contract dated March 30, 1893, as appears on the invoices for the rails, and in the master's report. These rails were originally entered on the books of the Newport News & Mississippi Valley Company as a purchase by it from the Carnegie Steel Company, Limited. The complainant (Huntington) in the original bill was president and the chief owner and stockholder in the lessee company, and also of the lessor company. The steel rails appear to have been in fact sold to H.. ttington, and on his credit, exclusively, by the Carnegie Steel Company, Limited; and the three notes on which recovery was finally sought under the petition were executed by the Chesapeake, Ohio & Southwestern Railroad Company, payable to the order of Mr. Huntington, and by him indorsed to the Carnegie Steel Company, Limited. At the time of the sale and delivery of these rails, as will appear, the Chesapeake, Ohio & Southwestern Railroad Company was neither in possession of nor operating the railroad, but the same was in the possession of and being operated by the lessee company. During August, 1893, or later, the entries previously made on the books of the Newport News & Mississippi Valley Company were canceled. After the lessor company had been restored to the possession of the railroad and railway property, and had opened up a set of books, direction was given from the New York office of the two companies that the entire purchase of 3,000 tons of rails should be credited on the books of the lessor company to the Carnegie Steel Company, Limited, which was done. By the direction or procurement, evidently, of Mr. Huntington, and for his own purpose, the lessor company was then caused to execute the three notes now in question, payable, as stated, to the order of Mr. Huntington, and indorsed by him to the Carnegie Steel Company, Limited. Upon these and other facts not necessary to be more particularly detailed, the special master found that the steel rails for which these notes were given were sold to Huntington for the Newport News & Mississippi Valley Company, and not to the Chesapeake, Ohio & Southwestern Railroad Company; and the circuit court concurred in this finding. As, however, the lessor company had executed its notes for the amount, the claim was allowed as a general debt as between the two companies; both virtually under Mr. Huntington's control. The court held that the trustees in the second mortgage were not to be affected by the mere form which the transaction was finally made to assume, and that, in determining whether the claim was a preferential one as against the mortgagees, the real facts of the original transaction were open to inquiry. The claim to a lien for this debt was consequently denied upon the ground stated, that the steel rails were sold to Huntington, and on his credit, and purchased by the Newport News & Mississippi Valley Company, and not by the

Chesapeake, Ohio & Southwestern Railroad Company.   We have no difficulty in accepting this conclusion of the master and circuit court, under the rule applicable to such a finding.   Our own examination of the record satisfies us that this question of fact was well decided.   The proposition, then, that the steel rails were sold to Huntington for the lessee company while in possession and operating the railroad, and not to the lessor company, completely removes every other ground suggested in argument on which this debt should be treated as a preferential claim, and a more particular discussion of this branch of the petitioner's contention does not seem to be required.

There is nothing in the case of Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 18 Sup. Ct. 657, in conflict with what is here decided.   In that case, upon the evidence contained in the record, the court said:

"We hold that the contract upon which both interveners relied—the deliveries of coal furnished by the Sloss Company being under the contract which had been made with the Virginia Company—was made with the Danville Company; but we conclude from the terms of the contract that the intention of the parties was that the coal was to be used in the operation of the lines of the Central Company, and that the mining companies did not rely simply upon the responsibility of the Danville Company, but, on the contrary, that the coal companies looked to the earnings of the Central System as the source from which the funds to pay for the coal to be furnished were to be derived."

The coal was furnished to, and the bills originally made out against, the owning company (Central Company), and not against the operating company, and the offer to sell and the written acceptance were expressly on behalf of the owning company.   It was stipulated in the agreed statement of facts that during the receivership a sum had been expended in betterments on the lines much larger than the supply claims.   This expenditure was out of the surplus earnings of the receivership.   These and other features of that case clearly distinguish it from this.   The court expressly guarded the decision against misconstruction by saying the court must not be understood as detracting from the utterances of previous cases.

We now come to a question made by the Carnegie Steel Company, Limited, as a general creditor, in relation to certain claims paid out of what it is claimed were the net or surplus earnings under the first receivership under the Huntington bill, covering the period from December 28, 1893, to January 19, 1895, when the original bill for the foreclosure of the second mortgage was filed.   It is insisted that the money in the treasury of the Chesapeake, Ohio & Southwestern Railroad Company at the time of the appointment of the receivers under the Huntington bill, together with the sums collected on accounts due that company, should be added to the surplus earnings during the first receivership, making in the aggregate a large sum for distribution among the general creditors.   It was insisted in the court below that various debts and claims had been paid out of the surplus earnings accumulated during the first receivership, not properly payable out of that fund, and that there had consequently been a diversion of the net earnings during the first receivership, which should be restored by reimbursing the income from the corpus of the property to the extent of such diversion.   Objection to a number of the claims paid is no longer in-

sisted upon in this court. It is now insisted that there was an improper application of the funds accumulated during the first receivership only to the extent of $251,828.06. The objection extends to the amount paid out on the Chesapeake, Ohio & Southwestern Railroad Company's first mortgage coupons under order of the court, to the sum used to pay certain equipment trust notes and certain preferential claims in favor of the Newport News & Mississippi Valley Company for materials and supplies. The equipment trust notes or bonds were executed for partial payments on rolling stock purchased and used in the operation of the road; the receivers having, after their appointment, adopted the contract upon the ground that it was necessary to keep the rolling stock for use in the operation of the railroad. The insistence that there was a large accumulation of surplus earnings during the first receivership, and that there was a diversion of such earnings, is rested mainly on the view that the Huntington bill was a general creditors' bill, exclusively. It could hardly be maintained that the expenditures made would not have been properly payable out of the income under a foreclosure bill, or a bill filed in the double aspect of both a foreclosure and general creditors' bill. It was consequently made a question in the court below, and also here, whether the Huntington bill was a general creditors' bill, exclusively. In dealing with this question and the question of net earnings, the court below, after extended reference to the charges of the original bill, said:

"The conclusion which we, therefore, reach, is that this bill was not a bill exclusively for the benefit of general creditors. It was a bill to which the mortgagees under the second mortgage were parties, and which sought the foreclosure of that mortgage. The authorities limit the exclusive right of a second mortgagee to the income of a receivership created under a bill filed by him to a case where the first mortgagee is not a party to the suit. Miltenberger v. Railroad Co., 106 U. S. 286, 307, 1 Sup. Ct. 140. If this is so as to a bill filed by a second mortgagee, it must be so, for a stronger reason, where the bill is filed by a general creditor, not only for the purpose of impounding the revenue for the benefit of the general creditors, but for the purpose of foreclosing the second mortgage. In such case the income must be expended according to the priority of the contract of the several creditors who become parties to the proceeding. But if we assume that the second mortgagees are improper parties to that bill, and that it is to be treated as a bill for the benefit of general creditors, we have then to deal with the question as to the proper application of the income under such a bill. It is to be noticed that, in that aspect of it, it is not a bill by a single creditor for the purpose of impounding the income for the satisfaction of his debt, but it is a representative bill filed for the purpose of reaching the income, and applying it in satisfaction of all creditors who are entitled to proceed against the income, other than the mortgagees. The bill specifically states the fact that there are claims aggregating nearly two millions of dollars for materials and supplies, which claim priority of satisfaction, and the complainant excuses himself from making these claimants defendants or co-complainants for the reason that he does not know their names or residences. The object of the bill is to wind up the said railroad as an insolvent corporation, and, as originally framed, to sell the property subject to its mortgages, if necessary. Its purpose is to prevent the separate maintenance of suits by the holders of preferential claims, and the disintegration of the road by sales in parts or parcels for the satisfaction of taxes alleged to be due, amounting to more than $90,000. The preservation of the integrity of the road and its continued operation was the primary object which the pleader had in mind when the original bill was drafted. But it is insisted by the general creditors that that class of debts, for wages, and for materials, and for supplies,

and for traffic balances, which, under some circumstances, have been held entitled to payment out of the corpus of the mortgaged property in preference to the mortgagee, and which have been paid out of the income arising under the first receivership, constitute a diversion of the income impounded under their bill, and that the corpus of the property should reimburse the income to the extent of such diversion. The class of claims referred to are claims which have been denominated by the supreme court, in many decisions, as 'debts of the income.' They constitute debts of the income, upon the theory advanced in the cases of Fosdick v. Schall, 99 U. S. 235; Miltenberger v. Railroad Co., 106 U. S. 311, 1 Sup. Ct. 140; Burnham v. Bowen, 111 U. S. 176, 4 Sup. Ct. 675; Kneeland v. Trust Co., 136 U. S. 89, 10 Sup. Ct. 950; Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. 824,—that the current income of a railway is to be devoted primarily, by the implied consent of the mortgagees, to the payment of the current operating expenses, and that if such income is diverted to the payment of interest, or permanent improvements to the mortgaged property, such shall be entitled to a preference out of the income of the mortgagee's receivership, or, if necessary, out of the corpus of the property, to the extent of such diversion. And, independent of any diversion, certain debts have been preferred which are for labor and supplies furnished shortly prior to the receivership to keep the road a going concern, upon the theory that thereby the mortgaged property has been preserved, and enabled to perform its duty to the public as a common carrier.

"The question we have here to deal with is not whether these preferential claims are entitled to be paid out of the corpus of the property, because of an original diversion by the railroad company of income for the purpose of the improvement of the mortgaged property, or for the payment of interest upon the mortgage debt, for no such diversion is alleged or proved. But the insistence is that where general creditors obtain a receiver for the purpose of operating the road and applying the income, after the payment of operating expenses, in satisfaction of their debts, preferential claims paid out of said income constitute a diversion of the assets, and that general creditors may be reimbursed out of the corpus of the property, and at the expense of the mortgagees. To this claim we cannot agree at all. It is utterly unsound in law and morals, especially under a bill framed for the purposes for which this bill was framed. These preferential debts are primarily debts of the income, and a general creditor cannot obtain satisfaction out of the income in preference to such debts. The surplus of income must first be applied, in our judgment, to the payment of debts incurred prior to the appointment of the receiver, for wages and labor and materials and supplies; and it is only the surplus remaining after the discharge of debts which were presented under such a receivership that is properly applicable to general creditors. The appointment of a receiver is, in a large sense, subject to the discretion of the court; and the court may, as it did in this case, appoint the receiver upon condition that these preferential debts shall be paid out of the surplus of the income over and above the expenses of the operation of the road. One of the objects of this bill was that the taxes to accrue and accrued, and which threatened the integrity of the road, should be paid. The bill prayed that such taxes might be paid, and the court granted the prayer of the bill. Clearly, taxes which were paid by the first receiver were properly paid out of the net income of the road. All preferential claims which were set up and established in this cause, and which were entitled to be paid out of the income in preference to the mortgagees, are likewise entitled to be paid in preference to the general credits, as against the net earnings. We are also of opinion that where the counsel controlling such general creditors' bills obtains or assents to an order directing the payment of equipment trust bonds, or of equipment trust notes, or equipment trust coupons, such payments being made for the purpose of preserving the rolling stock of the company, that its operation by the receiver which they have obtained might not be interfered with, are proper disbursements of the income, and the general creditors assenting to such disbursements will not be suffered to say that they were diversions of the income in behalf of the mortgage creditors. So, with respect to the payment of coupons upon the Paducah & Elizabethtown mortgage, and the sinking fund due under that mortgage, and coupons maturing under the first mortgage, it

was deemed essential by the court that these two underlying mortgages should not be suffered to mature, and that it was essential, in the interest of all the creditors, secured and unsecured, that the interest should be kept down upon these senior mortgages. At an early day in the history of this receivership the complainants themselves asked and obtained direction that the receivers should pay the interest upon both of these mortgages out of the earnings of the receivership. It is true that at a later day, when that order was repeated with reference to certain interest which had not yet been paid under the previous orders, counsel for the general creditors objected, and that the court reserved the right to protect the general creditors against such order in case it should finally determine that the payment of such interest was an improper use of the impounded income. We think that objection came too late. The complainants themselves had regarded that as proper policy, and had themselves induced the court to make the order directing the payment of such interest, and ought not to be now suffered to complain. We are, therefore, of opinion that the disbursements by the receivers on account of equipment trust obligations, and on account of the Paducah & Elizabethtown mortgage, and on account of the first C., O. & S. W. mortgage, were proper applications of the income impounded under Mr. Huntington's bill, if it be treated as a bill for the benefit of general creditors. So, with respect to the alleged additions and improvements for which the sum of $117,909.83 was paid; these additions and improvements were made presumably with the assent and consent of the general creditors represented by Mr. Huntington's bill. The cases of McIntosh v. Railroad Co., 34 Fed. 608, and Central Pac. R. Co. v. U. S., 99 U. S. 420, are not in point with respect to such expenditures. Those cases all turn upon the construction of contracts between creditors or between the railroad companies and the United States, as embodied in statutes; and in the last case the United States supreme court took occasion to approve that method of railroad bookkeeping by which ordinary improvements and betterments, not constituting new construction, are charged to current expense account. We think, under the circumstances here, that the receivers were justified in making these expenditures, and that the general creditors, by their failure to object, have approved this character of expenditures, and that they ought not now to be suffered to treat that as an improvement of the roadway for the benefit of the mortgagee. In this view of the case, there are no net earnings arising from the operation of the railway for distribution among the general creditors."

In the views thus stated, and in the conclusion arrived at, we concur. The result thus reached renders it unnecessary for us to consider or decide the question of jurisdiction, to which much of the argument at bar was devoted. The proposition that there were no surplus earnings during the first receivership for distribution among the general creditors eliminates that question from the case. The claims, to the payment of which exception is withdrawn in this court, rest substantially upon the same grounds as those the allowance of which is still resisted. Both classes of claims were essential to the preservation of the railroad as a system, and to its successful operation, and without which substantial earnings would have been impossible. The Huntington bill clearly presented a situation requiring these expenditures, and the suit throughout was conducted mainly with reference to the case presented in that bill. We conclude that none of the assignments of error by either of the appellants can be sustained, and the result is that the decree below is affirmed.