**In re NEW YORK STATE RYS.**

District Court, N. D. New York.

Sept. 26, 1936.

Willis H. Mitchell, of Syracuse, N. Y., for trustee.

Archibald L. Jackson, of New York City, for The General Finance Corporation, claimant.

Hiscock, Cowie, Bruce & Lee, of Syracuse, N. Y. (Alexander H. Cowie and Matthew R. Quinn, both of Syracuse, N. Y., of counsel), for New York Cent. R. Co., claimant.

Harris, Beach, Folger, Bacon & Keating, of Rochester, N. Y. (Keith D. Poland and Daniel M. Beach, both of Rochester, N. Y., of counsel), for Security Trust Co. of Rochester, trustee under consolidated mortgage.

Cook, Nathan, Lehman & Greenman, of New York City (Alfred A. Cook and Frederick F. Greenman, both of New York City, of counsel), for Lisman Committee of consolidated mortgage bondholders.

Sullivan & Cromwell, of New York City (Paul W. McQuillen, of New York City, of counsel), for Harris-Forbes Committee of consolidated mortgage bondholders.

White & Case, of New York City (Jesse E. Waid, of New York City, of counsel), for Bankers Trust Co., trustee under the first Rochester mortgage.

Hubbell, Taylor, Goodwin, Nixon & Hargrave, of Rochester, N. Y. (E. Willoughby Middleton, of Rochester, N. Y., of counsel), for Bankers Trust Co.

Van Schaick, Woods & Warner, of Rochester, N. Y. (Howard M. Woods, of Rochester, N. Y., of counsel), for first mortgage bondholders.

Mann, Strang, Bodine & Wright, of Rochester, N. Y. (Frank H. Parker, of Rochester, N. Y., of counsel), for Genesee Valley Trust Co., trustee under the second Rochester mortgage.

Morgan, Lewis & Bockius, of Philadelphia, Pa. (W. Heyward Myers, Jr., of Philadelphia, Pa., of counsel), for Genesee Valley Trust Co.

BRYANT, District Judge.

On July 2, 1936, the attorneys listed above met with me in conference for the purpose of devising methods to facilitate the issuance of a proposed plan for reorganization of the Rochester property of debtor. All were in agreement that certain disputed legal questions should be settled before any proposed plan is put forth. These questions relate to claims of various classes of creditors to certain funds. It was stipulated, on the record by the parties present, that these questions be submitted by briefs and reply briefs and that my decision thereon be final. The parties stipulating represent a large majority of each class of creditors. If any interested party not represented at the conference is dissatisfied with my holdings, opportunity to be heard will be given.

A few words by way of preface may prove helpful to those interested, but not wholly conversant with the situation. The New York State Railways for a number of years owned and operated street railways and some bus routes in and around the cities of Rochester, Syracuse, and Utica. Rochester is in the Western District of New York. All property other than the Rochester property is situate in the Northern District. Prior to and since receivership the operations have been accounted for through divisions known as the Rochester, Syracuse, and Utica divisions. All income and expenditures for each division have been, and now are, accounted for separately. Income and expenditures not chargeable to any particular division have been allocated on a percentage basis, which seems to be satisfactory to all.

Equity receivers were appointed in the Northern District on December 30, 1929, under a creditors' bill. Ancillary receivers under this bill were appointed in the Western District on January 23, 1930. At those times the Rochester property was covered in whole or in part by three mortgages. For convenience they will be referred to as the first mortgage, a mortgage with unpaid principal of $2,130,000, dated April 1, 1890, due April 1, 1930, which covers about

80 per cent. of the Rochester property and upon which interest and principal were defaulted April 1st, 1930; the second mortgage, a mortgage for $1,500,000, dated October 4, 1893, and due December 1, 1933, covering substantially the same property as the first and upon which default in interest was made December 1, 1929; the consolidated mortgage, a mortgage for $16,457,000, upon which interest was defaulted November 1, 1929, covering substantially all of the Rochester property, subject to the liens of the first and second mortgages. The consolidated mortgage also covers substantially all of the property, subject to certain underlying mortgages, in the Northern District.

On April 1, 1930, the consolidated mortgage trustee filed a foreclosure bill. In the Western District, the receivership was extended to this bill by order of Judge Adler made April 26, 1930.

During this period, the ancillary receivers accumulated a substantial fund from the operation of the Rochester property. It is at this point that we find two of the disputed questions presented.

(1) Does the impounding under the foreclosure date from the filing of the bill (April 1, 1930) or from the date of the order extending the receivership (April 26, 1930)?

The creditors' representatives contend for the latter date, while all mortgage representatives assert that the date of filing governs. I concur with the latter contention.

Westinghouse Electric & Mfg. Co. v. Brooklyn R. T. Co. (D.C.) 288 F. 221, 245, is directly in point. The precise question was there at issue. Judge La Combe, as special master, concluded that the period of impounding dated from the filing of the bill. His holding was confirmed by Circuit Judge Mayer. It is argued that this case should not be considered an authority because Judge Mayer in his confirmation by opinion did not mention this particular holding. Judge Mayer seems to have answered this argument when, in his opinion, he stated, "It will not be necessary to repeat at length the reasons and conclusions of the special master * * in those respects in which the court agrees with his conclusions." This holding is an affirmation of the conclusions expressed in Dow v. Memphis & L. R. R. Co., 124 U.S. 652, 8 S.Ct. 673, 31 L.Ed. 565; Chicago & Alton R. Co. v. United States & Mexican Trust Co. (C.C.A.) 225 F. 940, and Atlantic Trust Co. v. Dana (C.C.A.) 128 F. 209.

My attention has not been called to any state case where this question has been discussed. The cases cited in opposition to the above holding are ones where this point was not in issue. They cannot be considered as authorities on this question.

Aside from cases, a study of the discussion had before Judge Adler on March 29, 1930 (Steno.Minutes, pp. 16–17) makes it apparent that in reality he did extend the receivership to take effect April 1, 1930, although the formal order was not signed until the 26th.

(2) To whom does the income from December 31, 1929 (the date of the appointment of receivers under the creditors' bill), to April 1, 1930 (the date of the filing of the foreclosure bill), belong?

It is the contention of creditors, the consolidated mortgage trustee, and the various committees for bondholders under that mortgage, that it belongs to the unsecured creditors. The first and second mortgage trustees, and bondholders' committees under those mortgages, maintain that the income earned during this period belongs to the respective mortgages in the order of the priority of their liens.

It is an admitted fact that none of the mortgagees intervened in the creditors' actions or took any affirmative step to assert or protect their right to earnings until the filing of the foreclosure bill by the consolidated mortgage trustee on April 1, 1930. Until then the property was under the control of the receivers appointed in the creditors' suits. For clarity's sake, I will reiterate that we are here considering Rochester property only. I am not differentiating in the use of the words "ancillary receivers" and "equity receivers." Whenever reference is made to "equity, ancillary or creditors' receivers" it should be borne in mind the reference is to the receivers who were in possession of the Rochester property under the creditors' bill.

All agree that, in the absence of a provision in the mortgage giving the mortgagee the right to the income while the property is in the hands of a mortgagor, the mortgagee is not entitled to the income, even though the earnings are expressly pledged as security for the debt, until proper steps have been taken by the

mortgagee to assert his rights. This rule is so thoroughly established by United States and New York decisions that citations seem unnecessary. It is upon this rule that the creditors and consolidated mortgage interests rely to support their theory that the mortgage interests are not entitled to earnings prior to April 1, 1930.

While approving the general rule, as stated, the underlying mortgage interests claim it has no application to the present question because possession was taken for their benefit by the equity receivers. They base this claim of right to participate, according to rank and priority, in the earnings of the equity receivership, upon the distinction—real or fallacious—between a general creditors' and judgment creditors' bill. They admit that, under the latter, mortgagees are not entitled to income earned under receivership prior to the assertion of their rights. The former, they assert, "is merely an equitable levy and execution, for the benefit of all creditors, secured and unsecured, and the question of priority is to be settled in the same manner as if execution at law had been levied, at precisely the same time, as upon judgments duly rendered." Thomas v. Cincinnati, etc., R. Co. (C.C.) 91 F. 202, 204. Differently phrased, they contend that from appointment the equity receivers operated the property for all creditors, secured and unsecured, and that the earnings, after payment of expenses, "are held for the benefit of all creditors according to their rank and priority." Pennsylvania Co. for Ins. on Lives, etc. v. Philadelphia Co. (C.C.A.) 266 F. 1, 5. In addition to the Thomas and Pennsylvania Cases, supra Sage v. Memphis & L. R. R. Co., 125 U.S. 361, 8 S.Ct. 887, 31 L.Ed. 694; Farmers' Loan & Trust Co. v. American Waterworks Co. (C.C.) 107 F. 23; Haehnlen v. Drayton (C.C.A.) 192 F. 300, and Union Trust Co. v. Illinois M. R. Co., 117 U.S. 434, 6 S.Ct. 809, 29 L.Ed. 963, are cited in support of the underlying interests' contention. Several state cases have also been cited. They, being decisions in other jurisdictions, are valuable only as they show how other courts have interpreted and followed the above named cases.

The cases (supra cited), unless distinguished upon facts and points decided, are seemingly in conflict with United States Trust Co. v. Wabash Western R. Co., 150 U.S. 287, 14 S.Ct. 86, 87, 37 L.Ed. 1085, and the decisions of this Circuit.

The Wabash Case negatives the distinction drawn by the underlying interests. In that case the receivers were appointed under a bill "praying for the appointment of receivers to take possession of, preserve, and operate its lines of railroad for the benefit of its creditors, according to their respective legal and equitable rights." And yet under this, it was held that the mortgagees had no right to income prior to trustees' assertion of their right by filing a bill to foreclose, or demanding possession. Turning to this Circuit, we find the decisions uniformly holding that in general creditors' actions receivers are entitled to earnings until the mortgagees take proper steps to protect their rights. Dey v. Brenack Stevedoring Co., Inc. (D.C.N.D. N.Y.) 282 F. 886; London-Arizona Consol. Copper Co. v. Gila Copper Sulphide Co. (D.C.S.D.N.Y.) 257 F. 324; Westinghouse Electric & Mfg. Co. v. Brooklyn R. T. Co. (D.C.S.D.N.Y.) 288 F. 221; Pennsylvania Steel Co. v. New York City R. Co. (C.C.A.2) 231 F. 442; Pintsch Compressing Co. v. Buffalo Gas Co. (C.C.A.2) 280 F. 830; Prudential Ins. Co. v. Liberdar Holding Corporation (C. C.A.2) 74 F.(2d) 50.

The underlying mortgage interests, in their briefs, have attempted to distinguish these cases. Nothing can be gained by setting forth the reasons why their arguments are not accepted. Sufficient to say that the accepted rule in this Circuit is that receivers appointed under bills similar to present bill are entitled to earnings until mortgagee affirmatively asserts his rights. Here the assertion was made April 1, 1930. No New York case directly in point, that is a case bearing upon the alleged distinction between judgment and general creditors' bill, has been brought to my attention. In fact there is little, if any, occasion for such a question to arise in state court. However, the decisions of this state, almost without exception, hold that a mortgagee is not entitled to earnings until the mortgage lien is perfected by entry and possession. Sufficient to cite New York Security & Trust Co. v. Saratoga G. & E. L. Co., 159 N.Y. 137, 53 N.E. 758, 45 L.R.A. 132; Sullivan v. Rosson, 223 N.Y. 217, 119 N.E. 405, 4 A.L.R. 1400.

In support of their position the underlying interests draw analogy, or attempt to, from certain bankruptcy cases. They cite In re Industrial Cold Storage & I. Co. (D.C.) 163 F. 390, 391; In re Torchia (C.

C.A.) 188 F. 207; In re Dooner & Smith (D.C.) 243 F. 984, to show that when the property of a mortgagor is taken out of his hands by bankruptcy proceedings, neither the mortgagor, nor mortgagee, being in possession, the rents belong to the mortgage creditor and the trustee must administer the property in subordination to his rights. These are decisions of other Circuits. The rule followed in this Circuit seems to conflict with these decisions. If I were called upon for decision on this particular point, I would be compelled to follow the rule laid down in Re Brose (C.C.A.) 254 F. 664; In re Cigar Stores Realty Holdings, Inc. (C.C.A.) 69 F.(2d) 823; In re McCrory Stores Corporation (C.C.A.) 73 F.(2d) 270.

On April 1, 1930, the consolidated mortgage trustee filed a bill for foreclosure of its mortgage in both the Northern and Western Districts. In the Western District, the first and second mortgage trustees were made parties to the action. A reading of the complaint indicates they were made parties for the purpose of determining the amount and extent of their liens. The prayer, among other things, asks for sale subject to these liens, extension of receivership, and impounding of "the earnings and income of said property, assets and franchises to the use of the plaintiff and the holders of the bonds, with such powers and authority as are usually possessed by receivers in like cases as this court may direct."

Neither the first nor second mortgage trustees answered or appeared in this foreclosure suit until after October 11, 1930. This delay in submitting to the jurisdiction of the court was deliberate. In their reply brief, they say they feared "being consolidated with the Receivership in the Northern District where it was feared there might be large operating losses with which the First Mortgage Trustee might ultimately be charged."

From April 1, 1930, until October 11, 1930, the Rochester properties were operated under the receivership extended to the consolidated trustee's bill. Substantial earnings accrued. On October 11, 1930, the first mortgage trustee, with permission of the court, filed an independent bill in foreclosure. On the same day the same receivers took possession of the Rochester property under that bill. Here we find the third question submitted.

(3) To whom does the income from April 1, 1930 (the date when income began to be impounded under the consolidated bill), to October 11, 1930 (the date when income began to be impounded under the first mortgage bill), belong?

The consolidated mortgage trustee claims these earnings were impounded for the sole benefit of the consolidated bondholders. The first and second mortgage trustees contend that they belong to the bondholders of the three mortgages according to priority.

■ The underlying interests predicate their right to the earnings for this period upon the complaint and order extending the receivership, and upon the fact that the trustees under those mortgages were made parties to the foreclosure bill. They are in full accord with my holding that income under the foreclosure bill is impounded from date of filing the bill. Therefore, they must be in accord with the proposition that a subsequent order of extension of receivership does not affect the impounding unless it so expressly states. Here it does not. It is the usual order of extension based upon the bill. It formally extended the receivership to this action. The bill clearly asks that the income be impounded for plaintiff and the holders of the bonds secured by the Consolidated mortgage. Its filing began the impounding for their benefit unless they relinquished this right by making the first and second mortgage trustees parties.

■ The rule that a junior encumbrancer, who takes possession through receivership in a foreclosure suit to which the senior encumbrancers are not parties, is entitled to the earnings until possession is taken from him, is so well founded and uniformly held that discussion and citations are not needed. Where senior encumbrancers are made parties to the foreclosure, the junior mortgagees' rights to earnings are not exclusive. If the appointment is general in its nature, the respective rights to the rents are controlled by the priority of the liens. If the appointment is for the benefit of the junior mortgagee, then the earnings are for his exclusive benefit until the receivership is extended to the other liens.

■ The consolidated mortgage interests concur with the above. While the first and second mortgage interests do not so

state, it is apparent that they do. Authorities cited in support of their position clearly point to the distinctions stated. Pomeroy on Eq.Jurisdiction, (4th Ed.) § 1523; Beach on Receivers (2d Ed.) § 555; Miltenberger v. Logansport, C. & S. W. R. Co., 106 U.S. 286, 1 S.Ct. 140, 145, 27 L. Ed. 117; Ruhlander v. Chesapeake, Ohio & Southwestern R. Co. (C.C.A.) 91 F. 5; Cincinnati Nat. Bank v. Tilden, 66 Hun, 635, 22 N.Y.S. 11, 50 N.Y.St.Rep. 366; Frankenstein v. Hamburger, 73 App.Div. 352, 76 N.Y.S. 818.

Manifestly, the parties are not at variance over the law. They are at variance over the nature of the receivership. One claims it is for the sole benefit of the plaintiff. The other that it is for the benefit of all parties to the action, according to priority. I am in accord with the first contention. The bill specifically asks for appointment of receivers for the exclusive benefit of consolidated interests. Income began to be impounded in this action from date of filing of bill. Later, formal extension without specific instructions was signed. It extended the receivership to this bill which asked for sole possession of income. In other words, an order of extension, such as this, must be read with the bill. This seems to be in harmony with the cases cited by the underlying interests with possibly a few exceptions where the Miltenberger Case has been interpreted more broadly than the facts therein warrant. In that case the movant did not ask for a receiver for his own benefit, but asked that a receiver be appointed to operate the road and bring the earnings into court and pay same, under order of the court, "to such persons or corporations as shall be adjudged by the court to be entitled thereto." This fact, rather than the fact that senior encumbrancers were parties, governed. This is evidenced by a quotation from the opinion. The court said, 106 U.S. 286, at page 307, 1 S.Ct. 140, 158, 27 L.Ed. 117: "The original bill evinced no intention to create a receivership for the sole benefit of the second-mortgage bondholders. On the contrary, it asked that the net revenue of the receivership should be paid to such persons or corporations as should be adjudged by the court to be entitled to it. This was in substance saying to the first mortgagee that it too had an interest in the receivership." Certainly the first and second mortgage trustees could not have gathered

any such impression from the prayer of relief in the bill under consideration.

The underlying interests cite the Miltenberger Case as the leading one in support of their contention, and state that it has not only been followed in the federal courts, but that "the development of the law in the New York Courts has followed the rule laid down in the Miltenberger Case." Having held that the Miltenberger decision does not apply to this case, little would be gained by a review of other cases cited.

At the time of the appointment of receivers in the equity action there existed in Rochester a large number of assessments for street pavements, sidewalk pavements, sewers, etc. These assessments were payable in installments.

In order to better understand the nature of this indebtedness, it is advisable to briefly consider the statutory basis thereof. Section 124 of the Second Class Cities Law (Consol.Laws, c. 53) provides that the cost of street improvement for the space between the tracks and two feet in width outside the tracks shall be assessed against the railroad company and shall be collected "in the same manner as other expenses for local improvements are assessed, levied and collected in the city." Under section 152 of the Municipal Code of the city of Rochester, the city has the power to assess the expense, in whole or in part, "upon the property deemed benefited" and in the case of a street railway corporation to assess the expense "on the special franchises of such street railway corporation situate within the city." Section 150 gives the city authority to collect in installments and section 248 provides for time and manner of payment of installments and interest, anticipation of payments, etc. Section 262 makes every assessment "a debt and personal obligation in favor of the city and against the person or corporation assessed". Section 270 makes the assessments "a lien upon the land, tenements or real estate on which or in respect to which the same have been made and are and shall be a lien on the property assessed prior and superior to all other liens and encumbrances."

The ancillary receivers, on March 29, 1930, filed a petition in the Western District setting forth the fact that certain assessments were payable in installments; that they had been "advised by counsel

that said assessments should be paid as a proper cost of preservation of the properties now subject to the jurisdiction of the court and being-operated by the Ancillary Receivers" and requesting authority to pay, when due, the assessments. Judge Adler, by order, granted the authority. In the recitation in the order Judge Adler said: "And due consideration having been given the facts set forth in said petition, and it appearing that the paying of the assessments aforesaid is a proper act of preservation·of the property and business under the charge and management of the said Ancillary Receivers."

At that time no assessments were due. Two days later and before any assessments were payable possession was taken under the bill filed by the consolidated mortgage trustee, and the receivers under the equity action then ceased operations. While operating the lines under the· receivership extended to the above bill, the receivers paid some of the assessments and interest. October 11, 1930, possession was taken under the · first mortgage trustee's bill in foreclosure. Thereafter, and while operating under this last bill, they paid the balance of the assessments and interest. Here we find the fourth question.

(4) *Against what fund or funds shall the assessment payments and . interest be charged?*

The creditors and representatives of the consolidated mortgage and bondholders contend that the payment of assessments and interest must be charged to the receivership in. effect when paid. The first and second mortgage interests . contend these were prereceivership charges, and that the payments of both assessments and interest must be charged to the general creditors' fund.

I hold that these payments, both assessments and interest, must be charged to the receivership in effect when they were paid. Briefly, my reasons are:

At the time of the appointment of receivers in the creditors' bill, these assessments were specific liens against portions of the mortgaged property. They were also debts against the corporation. If not paid when due, it is very probable that the city of Rochester would have acted in an attempt to enforce the liens. These assessments had to be paid in order to insure possession of the property of the receivers. Judge Adler rightly recognized them as receivers' expense. Before any payments were due, or paid, possession was taken from the equity receivers. However, under the extended receiverships, the· receivers were faced with the same problem. The mortgage trustees were not compelled to ask, for possession. Having so asked, their receivers took possession for their benefit cum onere., The payments of paving assessments, which were a condition upon their continued occupation, must be considered a part of their current upkeep expense. They did not, as receivers under the foreclosure bills, obtain any specific authorization to pay. They relied upon the authority given them while equity receivers.· They paid in order to continue in possession, and the payment is a proper charge against the then possessor.

While these assessments were not taxes in the strict sense of the word, yet the analogy between the two is close. The assessments were "imposed upon the real estate by an exercise of the sovereign power of taxation, delegated by the state to the governing body of the city." In re Hun, 144 N.Y. 472–477, 39 N.E. 376, 377. The city using its power to tax for improvements, made the assessments which imposed a lien upon the property. It was in the nature of a tax which had become a lien before, but was not payable until after receivership. It must fall under the rule in this Circuit that a receiver is not required to pay taxes which accrued before he took possession or after he surrendered it. He is chargeable only with those taxes which accrued during his operation of the properties. Hammond v. Carthage Sulphite Pulp & Paper Co. (C. C.A.2) 8 F.(2d) 35; Prudential Ins. Co. v. Liberdar Holding Corp. (C.C.A.2) 74 F. (2d) 50. The possible exception, that preaccrued taxes must be paid by the receiver if they fall due'during the period of his occupancy, has no application.

Some emphasis is placed upon the substantial interest sums that accrued. It is argued that the ancillary receivers, being in possession of sufficient funds, should have anticipated the installment payments, thereby avoiding the interest expense. This argument is not convincing. When the receivers took possession, the revenue from operations were dropping and for a long time continued to drop. Expensive litigation over power rates was threatened. A draining of the cash at that time might

have caused financial embarrassment in future operations. Their tenure, as receivers, was insecure because preparation of foreclosure suits was being made. They exercised their judgment and asked for authority to pay when due. A consideration of the condition of the corporation and the business outlook at that time leads me to the conclusion that the receivers used good business judgment in conserving cash. Moreover, the first and second mortgage trustees are hardly in a position to question the receivers' actions in this regard. They knew how the payments were being made. In fact, a large portion were made after the first mortgage trustee filed his bill. They could at any time have intervened. Therefore, they were at all times in a position where they could get into court and ask that immediate payment be made. Not having done so, they cannot now complain of consequences resulting from receivers dealing with the property in a manner which they knew and made no attempt to change.

Equity supports my holdings. The improvements, for which the assessments were made, were permanent in character. They enhanced the value of the mortgaged property. It may be presumed that this enhancement equaled the cost. No injustice is done by making the parties, the value of whose property is increased, stand the expense, especially where, as here, they receive, in addition to enhancement, the earnings of the property.

Prior to receivership, the debtor was a self-insurer against compensation claims. It had on deposit with the Superintendent of Insurance certain securities, not for payment of compensation, but as security for the payment thereof. Prior to December 31, 1929, the receivership date, awards had been made to employees injured in the course of their employment. The State Compensation Law (Consol.Laws, c. 67) requires weekly payments and prescribes the period during which the payments shall be made. These awards constituted a fixed weekly liability uncertain only as to duration. The receivers acting under the various bills have paid the awards as they became due. They were authorized to pay by an order which recited that "the ultimate charging of such payments against any particular asset or fund of the defendant shall be subject to further order of the court." For clarity's sake, I should state that the receivers have

not, in any capacity, been self-insurers. All payments made applied on awards for injuries received prior to receivership. The facts here stated lead to the next question.

(5) Against which fund or funds shall the compensation payments be charged?

Again we find the same division of interests. The general creditors and consolidated mortgage interests contend that they should be charged against the operations of the receivership at the time of payment. The first and second mortgage interests claim the payment to be a charge against the creditors' fund.

We start with the proposition that the expense of carrying compensation insurance is a proper charge in the cost of operating the business of the employer. N.Y. Constitution, art. 1, § 19; Post v. Burger & Gohlke, 216 N.Y. 544, 111 N.E. 351, Ann.Cas.1916B, 158; Donovan v. Alliance Electric Co., 195 App.Div. 678, 186 N.Y. S. 813. With equal force, this applies to an employer who is a self-insurer. In such a case awards paid, instead of premium payments, are proper operating charges. I might say, necessary charges, because they have to be paid, in one form or the other, as long as the employer continues in business.

When, as in this case, the operation of the business is taken away from the self-insurer by the court and placed in the hands of receivers, the duty or obligation of paying the compensation claims falls upon the receivers. Bowen v. Hockley (C. C.A.) 71 F.(2d) 781, 94 A.L.R. 856; Wood v. Camden Iron Works (D.C.) 221 F. 1010; 28 U.S.C.A. § 124 (section 65, Judicial Code); Workmen's Compensation Law (Consol.Laws, c. 67) § 2, subd. 3. This statutory and case law does not place the burden or obligation upon the receivers through any rule of priority affecting pre-receivership claims. It imposes this duty upon the ground that these claims are operating charges. It makes them chargeable in the same manner that wages, power bills, and other operating expenses are chargeable. There can be no question but that wages, power bills, etc., are chargeable against the interests operating at time of payment. With equal force, this reasoning applies to the payment of compensation claims.

Independent of the statutory and case law, consideration of the orders under

which the receivers acted and the equity which must follow their granting leads to the same conclusion.

No inference of intention to charge payments made by receivers under the extended receivership to the equity receivers should be drawn from the provision of the order "that the ultimate charging of such payments against any particular assets, or funds, of the defendant shall be subject to the further order of this court." On January 22, 1930, in the Northern District, I made an order containing that provision. At that time, the Rochester property was being operated by receivers appointed by me. Operating receipts and expenditures for Rochester, Syracuse, and Utica were accounted for separately. There was some question whether a deficit in one division could be offset against a surplus in another. I had no information regarding any contemplated foreclosure or application for extension of receivership. At that time, no one knew whether each division would have sufficient earnings to meet the awards when due. In order to meet the situation, I made an order directing the receivers to pay the awards out of any funds on hand and reserved the ultimate charging of these funds. The next day ancillary receivers were appointed in the Western District and they took over the operation of the Rochester property. On March first, they obtained an order, practically a duplicate of the one I had signed. I am reasonably certain that Judge Adler, at that time, had no information regarding contemplated foreclosures or extension of receiverships. Undoubtedly, the reservation clause was inserted in his order for the purpose of giving the ancillary receivers the same directions and authority that had been given the primary receivers.

Judge Adler's order of March first must be considered as a direction to the receivers to pay these awards as operating charges of the receivership. The order extending the receivership authorized them to act in the foreclosure suit "with like powers and duties" as in the creditors' action. One of their duties was to pay, as an operating charge, the installment awards. Later they were by order appointed receivers in the First Mortgage foreclosure suit. The order, among other things, directed them to continue the operation of the business; to discharge all the duties obligatory upon it; and to discharge any public duties imposed thereon. Clearly the directions placed upon these receivers under this bill, as a condition of their being allowed to operate for the benefit of the mortgage trustee, the payment of these recurring compensation claims.

The fact that the receivers were, under direction of the court, paying the compensation claims was well known to all of the mortgage interests prior to filing of any foreclosure bill. The mortgage trustees were not in any way compelled to assume them. Until they took possession, or something was done equivalent to the taking of possession, the earnings belonged to the equity receivers. Conversely, until then the expenses of operation were charges against the receivers' fund only. The last statement does not in any way refer to a possible situation where operating expenses exceed income. Such a situation is not here present. If the mortgage trustees thought these payments burdensome, they could have filed bills without request for impounding. Then they would have asked no favors, and could not have been burdened with any obligations. Instead, they came into court and requested appointment of receivers, or, the equivalent, the extension of the receivership for their benefit. The court did not have to grant these applications. Naturally it would not do so unless there was a condition, express or implied, attached to such granting that the applicant should "do equity in order to get equity." Fosdick v. Schall, 99 U.S. 235, 253, 255, 25 L.Ed. 339. One of the conditions here attached, both by express provision and implication, was the payment of operating charges which included the compensation claims. To hold otherwise might in many cases deny equity to that class of creditors which Judge Parker terms "the most helpless." The payments are charges against the funds of the receivers in control of operations when made.

No question of subrogation is here involved. Thus far there has been no enrichment of one class at the expense of another. The receivers, in each capacity, are required simply to pay the expenses incident to their possession.

The trustee has $21,617.27 and $1,176.24 interest earned thereon, which he holds subject to the direction of the court. This account represents moneys deposited, prior to receivership, with Manufacturers Trust Company, paying agent, to pay interest on

various bond issues. $20,012.50 of the coupon account was deposited to pay coupons on the consolidated mortgage; $475 was deposited to pay coupons on the first mortgage and the balance to pay coupons on some of the Northern District mortgages and to meet federal income taxes, payable in connection with the coupon interest. On March 23, 1933, at the request of the receivers, the bank returned this money to them. It has since been on deposit as a special fund.

(6) To which account should this fund be credited?

Phrasing the question in other words, Did the deposit with the bank create a trust for the benefit of the coupon holders, or was it merely a deposit with the direction to devote for a specific purpose but revocable at will? There is no evidence before me that would indicate any direction to hold this deposit in trust. In the absence of such evidence the deposit must be considered general. It should go to the general creditors. In re Interborough Consol. Corporation (C.C.A.) 288 F. 334, 32 A.L.R. 932.

No questions have been asked regarding the disposition of any earnings since the beginning of operations under section 77B of the Bankruptcy Act (11 U.S. C.A. § 207). From this I assume that all parties interested are in accord regarding such disposition. Therefore, this decision is limited to allocation of earnings under the receiverships only.

I have purposely refrained from mentioning amounts under the various allocations. These figures can be furnished readily by the engineers and accountants.